892 P.2d 852

**STATE of Arizona, Appellee,**

v.

**Jerry Perales BARRERAS, Appellant.**

**No. CR–92–0343–AP.**

Supreme Court of Arizona, En Banc.

March 23, 1995.

Grant Woods, Atty. Gen. by Paul J. McMurdie and Gregory A. McCarthy, Phoenix, for State.

Wisdom, Logan & McNulty by James L.P. Logan, Phoenix, for Jerry Perales Barreras.

## OPINION

FELDMAN, Chief Justice.

On March 25, 1992, Defendant Jerry Perales Barreras pleaded no contest to one count of first-degree murder and one count of sexual assault. The superior court judge sentenced Defendant to death and a consecutive twenty-one year prison term. The clerk of court filed a notice of appeal on his behalf. *See* Ariz.R.Crim.P. 26.15, 31.2(b). We have jurisdiction under Ariz. Const. art. 6, § 5(3) and Ariz.R.Crim.P. 31.

## FACTS AND PROCEDURAL HISTORY

The victim, Kathy, lived with her family in an apartment complex near Seventh Street and Baseline Road in Phoenix. Kathy suffered from tuberous sclerosis [1] and, although she was nineteen years old, had the mental age of a three- or four-year-old. When Kathy spoke, her mental impairment was obvi-ous. She was very trusting, did not like to remove her clothes, and had no sexual experience.

On the afternoon and evening of January 3, 1991, Defendant and Salvador Romero were drinking beer and socializing at Charles Martinez's apartment in the same complex. Defendant was visibly "buzzed" but could speak intelligibly, negotiate steps, and, it turned out, ride his bicycle. Defendant spoke with Kathy several times as she rode her bicycle in the parking lot. At one point, he and Romero fixed her bicycle chain. Martinez later heard Defendant joking about Kathy and warned Defendant "to leave her alone" because she was "retarded." Romero also told Defendant that Kathy was mentally impaired.

Defendant left Martinez's apartment on his bicycle at about ten p.m. Kathy was still riding outside and a neighbor saw Defendant approach her and say, "Come on, Kathy, follow me. Okay?" Kathy then rode off with Defendant. Kathy's family soon noticed she was gone and began looking for her. As they drove toward a nearby golf course they heard three or four gunshots. They immediately saw Defendant, with a gun in his hand, riding away on his bicycle. The family members found Kathy's body lying nearby on the golf course. Her pants and top had been removed, her panties were around one ankle, and her bra was pushed up near her neck. She had suffered a contact gunshot wound to the forehead, gunshots to the lip and shoulder, a fractured skull, and various scrapes and bruises.

After police arrested Defendant early the next morning, he remarked, "How many times did the bullet hit her, man, I didn't mean to kill her. I didn't mean to kill her." Defendant later claimed he left the apartment alone and stopped at the golf course to urinate where Kathy surprised him. He said that they had consensual intercourse and that while he was dressing his gun fell from his pocket. After he picked it up, it inexplicably fired. Defendant claimed he did not know why or how many times the gun fired.

---

1. A "multisystem [affliction] producing the typical triad of seizures, mental retardation, and skin nodules on the face...." STEDMAN'S MEDICAL DICTIONARY 1264 (5th Lawyer's Ed.1982).

He maintained he did not know Kathy was mentally impaired.

A Maricopa County grand jury indicted Defendant on counts of first-degree murder, sexual assault, aggravated assault, and kidnapping. After initially pleading not guilty, Defendant attempted to plead guilty to all counts, ostensibly to spare the victim's family the additional grief engendered by a trial. The trial court refused to accept his pleas, however, when Defendant insisted that he had consensual sex with Kathy. In a subsequent written agreement, Defendant pleaded no contest to first-degree murder and sexual assault and the state dropped the other charges. The agreement noted that the state would seek the death penalty.

After a mitigation hearing, the trial judge found Defendant committed the murder in an especially heinous and depraved manner. He sentenced Defendant to death after concluding that evidence of Defendant's low IQ, diminished mental capacity, impulse control disorder, and concern for the victim's family did not require leniency.

## DISCUSSION

Defendant does not dispute his guilt or the validity of his pleas and convictions. Instead, he challenges only the propriety of his sentencing hearing and death sentence. We consider each of his claims in turn.

### A. The constitutionality of Arizona's death penalty statute

Apparently to preserve issues, Barreras argues that Arizona's capital sentencing scheme is unconstitutional on several grounds. Defendant's brief candidly and correctly concedes that this court or the United States Supreme Court previously has rejected each of his constitutional claims.[2] We do not revisit these issues. *See State v.*

*Atwood,* 171 Ariz. 576, 645 n. 21, 832 P.2d 593, 662 n. 21 (1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993).

### B. The sentencing hearing

#### 1. *Compliance with* Ake *and A.R.S. § 13–4013*

■ Relying on *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), Defendant argues that the trial court exceeded its discretion and violated his due process rights by refusing to continue his mitigation hearing so a defense expert could be present to assist in cross-examining a state expert. He urges that when an expert is appointed to assist a defendant, the court should not limit the use of that expert.

The mitigation hearing lasted two days. Two defense psychologists, Drs. Tatro and Blackwood, testified on the first day. The state's expert, Dr. Bayless, originally was also scheduled to testify that day. Defense counsel had said he wanted Dr. Tatro present to help him cross-examine Dr. Bayless, to which the trial court replied, "That's between you two to work out. If you want to have him here, that's up to you." The first day ended, however, before Dr. Bayless could testify. Defense counsel then told the court he was worried that Dr. Tatro might not be available the next day. The prosecutor stated he was unsure if he would call Dr. Bayless and agreed to inform defense counsel the next morning.

The state did call Dr. Bayless the next morning. Defense counsel moved to continue the hearing until Dr. Tatro could be there. Noting that Dr. Bayless was present and ready to testify, the trial court denied the motion. The court offered, however, to provide a transcript of Dr. Bayless' testimony for Dr. Tatro to review and invited Defen-

---

2. Defendant makes the following claims: the especially heinous, cruel, or depraved factor violates equal protection, *rejected by Walton v. Arizona,* 497 U.S. 639, 653–55, 110 S.Ct. 3047, 3056–58, 111 L.Ed.2d 511 (1990), *aff'g State v. Walton,* 159 Ariz. 571, 769 P.2d 1017 (1989); Arizona's death penalty discriminates against poor, young, and male defendants; is imposed arbitrarily and irrationally; and constitutes cruel and unusual punishment, *rejected by State v. At-*

*wood,* 171 Ariz. 576, 645 n. 21, 832 P.2d 593, 662 n. 21, *cert. denied,* — U.S. ——, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993); broad prosecutorial discretion to seek the death penalty violates due process, *rejected by State v. Harding,* 137 Ariz. 278, 292, 670 P.2d 383, 397 (1983); sentencing by a judge violates the Sixth Amendment, *rejected by State v. Fulminante,* 161 Ariz. 237, 258, 778 P.2d 602, 623 (1989), *aff'd,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

dant to request additional hearing time to call Dr. Tatro in rebuttal. Dr. Bayless then testified, harshly criticizing Dr. Tatro's methodologies and conclusions. Defense counsel did not call Dr. Tatro in rebuttal.

Neither *Ake* nor any other authority supports Defendant's claim that this procedure violated due process. *Ake* holds only that when the state presents psychiatric evidence at a capital sentencing hearing, due process entitles the defendant to "access to a psychiatric examination on relevant issues, to the testimony of the psychiatrist, and to assistance in preparation at the sentencing phase." 470 U.S. at 84, 105 S.Ct. at 1097. Our statute, A.R.S. § 13–4013(B), essentially codifies this holding.[3]

Both the statute and *Ake*, however, require only that a defendant be provided *access* to competent expert assistance. *State v. Herrera*, 176 Ariz. 21, 32, 859 P.2d 131, 142, *cert. denied*, —— U.S. ——, 114 S.Ct. 398, 126 L.Ed.2d 346 (1993). The trial court satisfied this requirement. It appointed two psychologists of Defendant's choosing—one before Defendant entered his plea and a second to assist in the mitigation hearing. Both examined Defendant and prepared written reports, both testified for Defendant at sentencing, and both were available to consult with defense counsel. *Cf. State v. Eastlack*, 180 Ariz. 243, 264, 883 P.2d 999, 1020 (1994) (finding error when capital sentencing proceeded without expert examination, consultation, or testimony). The court also gave Defendant the opportunity to call these defense witnesses in rebuttal. Neither *Ake*, A.R.S. § 13–4013(B), nor concepts of due process require more.

### 2. *Denial of the motion to continue*

■ Defendant claims the court erred in denying his motion to continue the sentencing hearing. We review denials of continuances only for abuse of discretion. *State v. Amaya–Ruiz*, 166 Ariz. 152, 164, 800 P.2d 1260, 1272 (1990). There is no abuse of discretion unless the court's actions "substan-

tially prejudiced the defendant." *State v. Clabourne*, 142 Ariz. 335, 342, 690 P.2d 54, 61 (1984). We consider all the circumstances of the case to decide if denial of a motion to continue violated a defendant's rights. *Amaya–Ruiz*, 166 Ariz. at 164, 800 P.2d at 1272.

■ There was no error in denying the continuance. The judge made it clear from the outset that defense counsel was responsible for ensuring Dr. Tatro's presence when the state's expert testified. Defense counsel knew in advance that Dr. Tatro might not be available on the hearing's second day. He could have but did not ask the court to schedule the first day's witnesses accordingly. Moreover, defense counsel requested a continuance of at least six days when Dr. Bayless was present and prepared to proceed. Considering all these factors, the judge acted well within the latitude that trial courts need to manage their dockets.

There is also no evidence of prejudice to Defendant. Defendant's appointed experts submitted written reports and testified at length in his behalf. *Cf. Eastlack*, 180 Ariz. at 260–64, 883 P.2d at 1016–20. Dr. Bayless did not actually examine Defendant. His testimony was limited to criticizing Dr. Tatro's findings. The state gave a copy of Dr. Bayless' report to defense counsel two days before he testified, and defense counsel cross-examined Bayless at length, presumably having prepared by conferring with Dr. Tatro. The trial court, moreover, offered to provide a transcript of Dr. Bayless's testimony for Dr. Tatro to review and to entertain allowing him to testify later in rebuttal. Defendant's failure to call Dr. Tatro in rebuttal undermines any notion that Dr. Tatro's physical presence for cross-examination would have helped Defendant. There is simply nothing in the record indicating that Defendant was prejudiced. We find no error.

### C. The death sentence

■ We independently review the aggravating and mitigating circumstances in all capital cases, "weighing" the evidence to de-

---

**3.** The statute provides, "When a person is charged with a capital offense the court ... shall upon application of the defendant and a showing that the defendant is financially unable to pay for such services, appoint such investigators and expert witnesses as are reasonably necessary adequately to present his defense at trial and at any subsequent proceeding."

termine whether the death penalty is appropriate. A.R.S. § 13–703.01(A); *State v. Wood,* 180 Ariz. 53, 68, 881 P.2d 1158, 1173 (1994). The trial court here found that Defendant committed the murder in an especially heinous and depraved manner and that the mitigating evidence was not substantial enough to require leniency.

### 1. *Weighing aggravating and mitigating circumstances*

Defendant makes a novel argument that A.R.S. § 13–703(E) does not permit courts to weigh aggravating and mitigating circumstances and that this balancing test places an additional burden on the defendant that the statute neither requires nor contemplates. He claims that § 13–703(E)[4] instead requires a finding regarding aggravating circumstances. When at least one is found the defendant becomes eligible for the death penalty, and, Defendant argues, the court must then independently assess, without regard to the aggravating factors, whether the mitigating evidence is substantial enough to require leniency. Defendant asks us to revisit the long line of cases utilizing the weighing approach.

We decline that invitation. By saying that we weigh aggravating and mitigating circumstances we simply describe the process used to determine, as required by the statute, whether mitigating evidence is "sufficiently substantial to call for leniency." A.R.S. § 13–703(E); *State v. Stuard,* 176 Ariz. 589, 610, 863 P.2d 881, 902 (1993) ("One mitigating circumstance, for example may be '*sufficiently substantial*' *to outweigh* two aggravating factors.") (citations omitted, emphasis added). This, of course, requires an evaluation of the strength and quality of both the aggravating and mitigating evidence. Such evaluations necessarily involve subjective judgment. Nothing in the constitution or statute prohibits this practice. Indeed, the statute contemplates it once the evidence makes the defendant eligible for the death penalty. *Richmond v. Lewis,* —— U.S. ——, ——, 113 S.Ct. 528, 535, 121 L.Ed.2d 411 (1992) ("Read most naturally, [A.R.S. § 13–703] requires the sentencer ... to determine the relative substance of the [aggravating and mitigating] factors."). While we acknowledge the problems inherent in leaving the ultimate decision on life or death to human judgment, we know of no other way to accomplish the task. Nor can we determine whether mitigating evidence is "sufficiently substantial" in a vacuum, without comparing it to the aggravating factors. *See State v. Willoughby,* 181 Ariz. 530, 548, 892 P.2d 1319, 1337 (1995) (discounting significant mitigating evidence based on factual severity of a single aggravator).

### 2. *The aggravating circumstance*

Citing the definitions in *State v. Knapp,* 114 Ariz. 531, 543, 562 P.2d 704, 716 (1977), rather than the factors listed in *State v. Gretzler,* 135 Ariz. 42, 52–53, 659 P.2d 1, 11–12, *cert. denied,* 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), the trial court found that Defendant committed the murder in an especially heinous or depraved manner. A.R.S. § 13–703(F)(6). In support of this finding the judge noted Kathy's mental impairment and Defendant's awareness of her condition, Kathy's helplessness, the murder's senselessness, and that the "only apparent reason for killing Kathy" was to eliminate her as a witness. Defendant challenges this finding on several grounds.

■ Although the *Gretzler* factors are not absolutely exclusive, *see State v. Milke,* 177 Ariz. 118, 126, 865 P.2d 779, 787 (1993), they provide a consistent and rationally reviewable standard for the otherwise vague (F)(6) "especially heinous, cruel or depraved" factor, thus ensuring the continuing constitutionality of our death penalty statute and facilitating our independent review. *See Arave v. Creech,* —— U.S. ——, ——, 113

---

4. The statute provides, "In determining whether to impose a sentence of death or life imprisonment, the court shall take into account the aggravating and mitigating circumstances included in subsections F and G of this section and shall impose a sentence of death if the court finds one or more of the aggravating circumstances enumerated in subsection F of this section and that there are no mitigating circumstances *sufficiently substantial* to call for leniency." (Emphasis added).

S.Ct. 1534, 1544, 123 L.Ed.2d 188 (1993) (approving similar factor in "light of [its] consistent narrowing definition"); *Richmond v. Lewis,* — U.S. —, —, 113 S.Ct. 528, 536, 121 L.Ed.2d 411 (citing *Gretzler* as "the narrowing construction of Arizona's (F)(6) factor"). We therefore urge trial courts to apply the *Gretzler* standards when considering this aggravating circumstance.

Though not so styled, the trial court's special verdict here clearly shows that it relied on several *Gretzler* factors in finding the heinous. or depraved circumstance. Because both the state and Defendant recognized this and cited the *Gretzler* factors in their briefs and at oral argument on this issue, we review the § 13–703(F)(6) finding under the *Gretzler* framework.

■ The heinous or depraved elements of (F)(6) focus on the defendant's mental state as shown by his actions. Under *Gretzler*, we consider five factors to determine if a murder was especially heinous or depraved: 1) relishing the murder, 2) inflicting gratuitous violence, 3) mutilating the victim, 4) the senselessness of the murder, and 5) the helplessness of the victim. 135 Ariz. at 51, 659 P.2d at 10. We have given the first three factors the most weight and consider the last two much less probative of the defendant's state of mind. *E.g., State v. Smith,* 146 Ariz. 491, 503, 707 P.2d 289, 301 (1985) (noting that senselessness and helplessness alone are not "ordinarily determinative on the question of heinousness or depravity"). Our subsequent cases have also identified witness elimination as an additional fact of some weight in finding the (F)(6) circumstance. *See, e.g., State v. Ross,* 180 Ariz. 598, 606, 886 P.2d 1354, 1362 (1994) (citing cases). To support a finding of heinous or depraved, the relevant factors must be proved beyond a reasonable doubt. *Id.*

■ The special verdict showed that the trial judge based his heinous or depraved finding on the senselessness, helplessness, and witness elimination factors.[5] We agree that this murder was senseless beyond a reasonable doubt. Defendant easily could have accomplished his objective of sexual assault without killing the helpless, mentally impaired victim. *See State v. Lopez,* 175 Ariz. 407, 412, 857 P.2d 1261, 1266 (1993).

Defendant argues that Kathy was not helpless because she was heavy and he is slightly built. This argument is patently without merit. Notwithstanding Defendant's diminutive size, Kathy's diminished mental capacity and functional age clearly rendered her helpless at Defendant's hands. *See State v. Zaragoza,* 135 Ariz. 63, 69, 659 P.2d 22, 28 (1983) (finding helplessness where elderly victim was easily manipulated and had limited mental capacity).

The trial court also found that the "only apparent reason" Defendant killed Kathy was to eliminate her as a witness. Given the paucity of facts to explain Defendant's actions or show why he killed, however, one could as easily conclude the killing was senseless because Defendant killed for no apparent reason. This, of course, shows the problem with the witness elimination factor. If the evidence shows no reason for a killing, as it very often does, then witness elimination will always be an apparent reason. Thus, as happened here, a trial judge can find aggravation both because the killing was senseless in that the defendant could have accomplished his purpose without killing and also in that he killed for no apparent purpose except to eliminate the victim as a witness. It is difficult to see how both factors logically can exist at the same time.[6]

**5.** In its brief, the state argued that the special verdict also showed that the trial court found gratuitous violence. We do not so read the special verdict. Even if we did, however, the record does not support such a finding beyond a reasonable doubt. *Cf. State v. Lopez,* 175 Ariz. 407, 412, 857 P.2d 1261, 1266 (1993). The state properly conceded as much at oral argument.

**6.** The concurrence asserts that this court has "not hesitated" to rely on both senselessness and witness elimination in the same case. But a fair reading of the cases it cites belies that claim. In *State v. Stanley,* 167 Ariz. 519, 528–29, 809 P.2d 944, 953–54, *cert. denied,* 502 U.S. 1014, 112 S.Ct. 660, 116 L.Ed.2d 751 (1991), we merely noted that the trial court referred to witness elimination. We did not independently review that finding to determine if it was proven beyond a reasonable doubt, nor did we assign it any weight. Rather, we upheld the depravity finding primarily because Stanley murdered his own young child. *Id.* (noting that the "killing of a

We recently dealt with part of this problem by summarizing the findings necessary to support the witness elimination factor, noting that "[t]oo often, claims of witness elimination are made with no evidence to back them up." *Ross,* 180 Ariz. at 606, 886 P.2d. at 1362. We clarified that the witness elimination factor only applies if: 1) the victim witnessed another crime and was killed to prevent testimony about that crime, 2) a statement by the defendant or other evidence of his state of mind shows witness elimination was a motive, or 3) some extraordinary circumstances show the murder was motivated by a desire to eliminate witnesses. *Id.* Such extraordinary circumstances, however, exist only in "extreme" cases. *Id.*

The record here does not support a finding beyond a reasonable doubt that witness elimination motivated Defendant. Kathy did not witness any unrelated crimes and Defendant said nothing to show witness elimination was his motive. Nor are there sufficient other circumstances present here to make this an extreme case. The trial court could only say that witness elimination was "*apparent[ly]*" a motive. Special Verdict at 2. Although some aspects of the crime hint at it, we cannot say beyond a reasonable doubt that witness elimination motivated Defendant. Lacking *Ross*'s clarifying definition, the trial court erred in relying on this factor.

We are left then with only the last two *Gretzler* factors—senselessness and helplessness. As noted, we have held that in most cases the senselessness and helplessness factors alone will not support a finding of heinousness or depravity. *Ross,* 180 Ariz.

at 606, 886 P.2d at 1362; *State v. Brewer,* 170 Ariz. 486, 502, 826 P.2d 783, 789 (1992) ("Factors 4 and 5 do not warrant a finding of heinousness or depravity unless accompanied by additional factors."). Although the question is close, we conclude here that they do not support a finding beyond a reasonable doubt that the murder was especially heinous or depraved within the meaning we have given those terms. *Cf., e.g., Milke,* 177 Ariz. at 126, 865 P.2d at 787 (upholding heinous and depraved factor where parent/child relationship was present in addition to senselessness and helplessness).

The facts of this case tempt us to expand the meaning of heinous and depraved, but to do so on a case-by-case basis would institute a regime of *ad hoc* sentencing, destroying the definitional consistency that preserves the constitutional validity of our sentencing process. *See Creech,* —— U.S. at ——, 113 S.Ct. at 1544; *Richmond,* —— U.S. at ——, 113 S.Ct. at 536. *See generally* Richard A. Rosen, *The "Especially Heinous" Aggravating Circumstance in Capital Cases—The Standardless Standard,* 64 N.C.L.REV. 941 (1986). If we could expand the meaning of the (F)(6) factor's broad language to encompass the facts of each case on the basis of our intuitive conclusion as to the proper penalty, we would indeed have abandoned the struggle to provide a consistent narrowing definition and conceded that the factor is unconstitutionally vague. We must therefore set aside the trial judge's finding that the heinous or depraved aggravating circumstance applies.

There being no other statutory aggravating circumstances, A.R.S. § 13–703(E) requires reduction to a life sentence without possibility of release for twenty-five years,[7]

helpless child ... [is] sufficient to indicate depravity"). And in *State v. Gillies,* we only recognized witness elimination in rejecting an argument that a murder is not senseless if done to eliminate a witness. 142 Ariz. 564, 570, 691 P.2d 655, 661 (1984), *cert. denied,* 470 U.S. 1059, 105 S.Ct. 1775, 84 L.Ed.2d 834 (1985). We did not give separate weight to both factors. *State v. King* recently recognized this limitation. 180 Ariz. 268, 286, 883 P.2d 1024, 1042 (1994) (citing *Gillies* and noting that witness elimination is considered "when refuting a defendant's arguments that a murder was not senseless because it was committed to avoid prosecution."). In fact, *State v. Correll,* 148 Ariz. 468, 481, 715 P.2d 721,

734 (1986), is the only case in which we have given weight to both senselessness and witness elimination. But neither of the cases we relied on in so doing actually found both factors. *See State v. Hensley,* 142 Ariz. 598, 691 P.2d 689 (1984); *State v. Smith,* 141 Ariz. 510, 511–12, 687 P.2d 1265, 1266–67 (1984). Notwithstanding *Correll,* we doubt the wisdom of double counting a single aspect of a murder to find an aggravating factor.

7. A.R.S. § 13–703(A) now permits a sentence of life without possibility of parole. *See* 1993 Ariz. Sess.Laws, ch. 153, § 1. The amended statute is inapplicable here, however, because this case

to be served *consecutively* to the twenty-one year sentence for sexual assault and to any other terms Defendant may be serving for other crimes. Our disposition of this issue makes it unnecessary to weigh the significant mitigating evidence involving Defendant's organic brain damage and low IQ.

## DISPOSITION

We have carefully examined the record for fundamental error. A.R.S. § 13–4035; *State v. Leon,* 104 Ariz. 297, 451 P.2d 878 (1969). We find none. We affirm Defendant's sexual assault conviction and sentence. We affirm Defendant's murder conviction but reduce his death sentence to a term of life imprisonment without possibility of release for twenty-five years consecutive to all other sentences.

MOELLER, V.C.J., and CORCORAN and ZLAKET, JJ., concur.

MARTONE, Justice, concurring.

I agree that the conviction should be affirmed and that, although a close question, a death sentence here could pose a threat to the constitutional validity of Arizona's narrowly tailored death penalty Statute. *Ante,* at 859–860. I write separately, however, to clarify the significance of our holding in *State v. Ross,* 180 Ariz. 598, 886 P.2d 1354 (1994), and the relationship between senselessness and witness elimination.

The majority is concerned that there is a "problem with the witness elimination factor." *Ante,* at 858. The perceived problem is that senselessness and witness elimination cannot "logically ... exist at the same time." *Id.* It arises, according to the majority, when a trial judge searches for the "only apparent reason" a victim was killed. When there is no apparent reason, the sentencing judge can simultaneously find two things— that the murder was senseless and that the "only apparent reason" for the murder was to eliminate the victim as a witness. This drives the majority's concern that a court may "double count[ ] a single aspect of a murder to find an aggravating factor." *Id.* at 858, n. 6.

We have not previously been perplexed by the relationship between senselessness and witness elimination. We have not hesitated to find both or allude to them both, and never once suggested the dilemma that troubles the majority. *State v. Stanley,* 167 Ariz. 519, 528–29, 809 P.2d 944, 953–54 (finding helplessness, senselessness, and witness elimination), *cert. denied,* 502 U.S. 1014, 112 S.Ct. 660, 116 L.Ed.2d 751 (1991); *State v. Correll,* 148 Ariz. 468, 481, 715 P.2d 721, 734 (1986) (finding helplessness, senselessness, and witness elimination); *State v. Gillies,* 142 Ariz. 564, 570, 691 P.2d 655, 661 (1984) (finding savage manner of death, senselessness, and witness elimination), *cert. denied,* 470 U.S. 1059, 105 S.Ct. 1775, 84 L.Ed.2d 834 (1985). We found senselessness in our recent *Ross* case, but still discussed the merits of witness elimination. That discussion would have been unnecessary if senselessness and witness elimination were mutually exclusive. We do the same here.

But if there had been a problem, *Ross* solved it. *Ross* provided a three-pronged test that eliminated the "only apparent reason" or "only reasonably ascertainable motive" test. No longer can a judge find witness elimination simply because there is no reason for a murder. The judge instead must find, beyond a reasonable doubt, that a motive was witness elimination, as defined by *Ross.* Evidence of senselessness is of a completely different nature and raises an unrelated question—whether the murder was unnecessary to allow a defendant to complete his criminal objective. *See State v. Comer,* 165 Ariz. 413, 429, 799 P.2d 333, 349 (1990), *cert. denied,* 499 U.S. 943, 111 S.Ct. 1404, 113 L.Ed.2d 460 (1991). If the objective is robbery, and a killing is unnecessary to achieve that objective, the killing is senseless. If the defendant then kills the storekeeper to retard his identification and apprehension, a court might also find witness elimination. On the other hand, if the objective is witness elimination, as "where the murder victim is a witness to some other crime, and is killed to prevent that person from testifying about the other crime," *Ross,* 180 Ariz. at 606, 886 P.2d

---

arose before its effective date. In any event, the consecutive nature of the sentences—21 years

plus 25 years before parole eligibility—makes them tantamount to life without parole.

at 1362, then senselessness and witness elimination cannot both be present. It thus depends on the case. Therefore, a sentencing judge can, in some cases, find that a murder was senseless *and* that a motive was to eliminate the victim as a witness, while in others the judge may not.