NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

GARY ROBERTS, *Appellant.*

No. 1 CA-CR 22-0028
FILED 12-6-2022

Appeal from the Superior Court in Maricopa County
No.  CR2020-126019-002
The Honorable Suzanne E. Cohen, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Jana Zinman
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Robert W. Doyle
*Counsel for Appellant*

**MEMORANDUM DECISION**

Presiding Judge Jennifer M. Perkins delivered the decision of the Court, in which Judge James B. Morse Jr. and Judge Michael J. Brown joined.

**P E R K I N S**, Judge:

**¶1**         Gary Roberts appeals his criminal convictions and sentences, arguing the superior court erred by instructing the jury that the victim was deceased at the time of trial. Roberts also argues the court admitted testimonial evidence against him in violation of his rights under the Sixth Amendment's Confrontation Clause. For the following reasons, we affirm.

**FACTS AND PROCEDURAL BACKGROUND**

**¶2**         We view the facts in the light most favorable to sustaining the jury verdict and resolve all reasonable inferences against Roberts. *See State v. Stroud*, 209 Ariz. 410, 419, ¶ 6 (2005). To protect the victim's identity, we refer to her as "Jane," a pseudonym.

## I.     Incident and indictment

**¶3**         On July 2, 2020, Roberts, Jane, and two women—Esmerelda Beltran and Breanna McKnight—entered a Phoenix bank. Rodney Greasham waited outside on the curb for the group. Roberts sat in the lobby while Jane and Beltran approached a bank teller. Jane attempted to withdraw money from the account of her boyfriend, Michael Bryant. When the teller requested identification, Jane mouthed the words, "call the cops." The teller mouthed the same in reply, and Jane nodded her head to confirm. Beltran could not see the interactions between Jane and the teller because of the large computer screen blocking the teller's face.

**¶4**         The teller left the counter to alert her manager, who came over to the counter. The manager wrote a message to Jane on a withdrawal slip, asking if she was in danger, and Jane nodded her head. The manager then passed a second note to Jane, asking whether Roberts had a gun; Jane again nodded her head.

**¶5**         The bank employees called the police who, upon arrival, spoke with all those present in the lobby, including Jane and Roberts. An officer brought Jane to a separate room, where she "broke down and started

2

crying." She showed the officer a burn mark on her leg, which bore the pattern and shape of a clothing iron.

¶6        Roberts denied having a gun when asked by the police. But a search of his person revealed a loaded handgun under his shirt and an extended magazine for a handgun in his pants pocket. Roberts provided the police with a false name and claimed to have no identification card. Roberts and the other group members were arrested at the scene. After being advised of his rights, Roberts apologized for lying about his identity and agreed to speak with the officers about why the group was at the bank.

¶7        Roberts told the officers that he sold his car the day before, but he did not have a bank account or Cash App. And because Jane had Cash App, the buyer transferred $2,000 into Jane's app. Jane was supposed to then give the amount to Roberts. But Jane had not done so, and when Roberts attempted to collect, Jane told him she had transferred the money to Bryant's bank account. Roberts told the officers he brought Jane to the bank to make the withdrawal, and that he was also waiting for Bryant to arrive.

¶8        After the officers concluded their questioning, they took Jane back to her apartment and waited for detectives to arrive. The officers described the apartment as "very disheveled" and "ransacked," with clothes scattered throughout, overturned furniture, and a broken door. The officers stayed with Jane until Bryant arrived, noting that she seemed "scared and relieved," that she was in pain, and showed them—in addition to the large burn on her leg—"fresh" burn marks on her right hand and wrist. Bryant arrived at the apartment about two hours later. The detectives intended to follow up with Jane at another time, but never had the opportunity.

¶9        At the police station, Roberts was further questioned about the activity leading up to the bank visit. Roberts stated he thought Jane had ripped him off, and he went to Jane's apartment with Beltran, McKnight, Greasham, and Roberts' mother to "get [Roberts'] money back." Roberts said that when the group could not find the money after searching the apartment, Beltran and McKnight used the hot iron on Jane and beat her up.

¶10        On August 5, 2020, the State charged Roberts with armed robbery (Count 1), burglary in the first degree (Count 2), kidnapping (Counts 3 and 4), aggravated assault (Counts 5 and 6), and misconduct

involving weapons (Count 7). Jane was murdered one week later, and police arrested Bryant as the suspect.

## II.     Pretrial evidentiary issues

¶11     The parties agreed that the circumstances of Jane's death had no relation to the events in Roberts' case but discussed whether to inform the jury why she didn't appear as a witness. The State moved to tell the jury of Jane's murder to explain why she would not testify, arguing that because she was a key witness and the sole victim of Roberts' crimes, her absence was relevant. Roberts objected to any mention of her whereabouts, contending it would cause the jury to draw a negative inference. The court granted the State's motion in part, ruling that the jury could be informed that Jane was deceased, but not that she had been murdered.

¶12     The State also moved to admit evidence of Jane's communications with the bank teller and manager, and video evidence from an officer's body camera during his interactions with Jane at the bank and at her apartment. Relevant to this appeal, the State moved to admit evidence that she mouthed "call the cops" to the teller, and that she nodded her head to the manager's written questions, "are you guys in danger?" and "does he have a gun?" The court admitted these statements over Roberts' objections.

## III.     Trial and subsequent motion for mistrial

¶13     The State informed the jury of Jane's death during opening statements: "[Y]ou won't be hearing from [Jane] in the course of this trial. [Jane] is dead. It wasn't because of the injuries in this case, but her death and her absence means that some of the exhibits in this case will have to be redacted for legal reasons, and so we are left working backwards." Before deliberations, the court instructed the jury that it "should not guess about the reason any other person is absent from the courtroom," and included a specific instruction about Jane:

> **ABSENCE OF [Jane]**
>
> There has been information presented that [Jane] is deceased. Her death is not due to any wrongdoing on the defendant's part. The fact that she passed away is not related to the defendant in any way. You are not to consider her death as any indication of the defendant's guilt or innocence.

The jury found Roberts guilty on all counts it considered, and the court sentenced him to the maximum sentence on most counts.

¶14        Roberts sought a new trial, arguing that it was error to inform the jury that Jane was deceased and the State's presentation to the jury constituted prosecutorial misconduct. The court denied Roberts' motion, finding the State never alleged or inferred in any way that Roberts was responsible for her death. The court rejected Roberts' assertion that the jurors "asked a multitude of questions" regarding Jane's absence, noting that during the trial the jury asked only two questions, neither of which was about her death. "There was no question from any juror about [Jane's] death during trial or during deliberation."

¶15        Roberts timely appealed. We have jurisdiction under Ariz. Const. art. VI, § 9 and A.R.S. §§ 12-120.21(A)(1), 13-4031, and 13-4033(A).

## DISCUSSION

¶16        Roberts argues the superior court improperly informed the jury that Jane was deceased. He also contends that admitting evidence of Jane's communications to the bank employees violated his rights under the Sixth Amendment's Confrontation Clause. We generally review the court's evidentiary rulings and decision to give a particular jury instruction for an abuse of discretion. *State v. Ellison*, 213 Ariz. 116, 129, ¶ 42 (2006); *State v. Burbey*, 243 Ariz. 145, 146, ¶ 5 (2017). We review evidentiary rulings that implicate the Confrontation Clause *de novo*. *Ellison*, 213 Ariz. at 129, ¶ 42.

## I.     Roberts failed to show prejudice from the jury's awareness of Jane's death

¶17        Roberts argues that jurors do not need to know why a witness is unavailable and informing the jury of Jane's death was prejudicial. Roberts and the State frame the question as an evidentiary issue although neither party presented actual evidence—no testimony nor documents—to the jury related to Jane's death. The issue of whether it was proper for the jury to be informed of Jane's death appears to be more of an instructional issue. But any arguments in that vein are waived and so we address the evidentiary principles surrounding the parties' arguments.

¶18        Other than repeatedly describing the fact of Jane's death as "irrelevant and prejudicial" in his opening brief, Roberts provided no argument, authority, or citation to the record to explain how the evidence prejudiced him. An appellant's opening brief must present and address significant arguments with supportive authority, thus setting forth his

position on the issue in question. *Schabel v. Deer Valley Unified Sch. Dist. No. 97*, 186 Ariz. 161, 167 (App. 1996). And our appellate rules require the appellant to provide an argument containing "supporting reasons for each contention, and with citations of legal authorities and appropriate references to the portions of the record on which appellant relies." *See* ARCAP 13(a)(7). "[I]f the appellant fails to properly develop an argument, the court may consider it abandoned and waived." *State v. Vargas*, 249 Ariz. 186, 191, ¶ 22 (2020).

**¶19** Even if we consider Roberts' argument contained in his reply brief, he still fails to explain *how* he was prejudiced. Nor does he point us to any authority or record evidence to support his claim other than reference back to his arguments to the superior court. *See State v. Broughton*, 156 Ariz. 394, 397–98 (1988) (holding that prejudice requires a showing of more than mere speculation). "Evidence is unfairly prejudicial only when it has an undue tendency to suggest a decision on an improper basis such as emotion, sympathy, or horror." *State v. Gulbrandson*, 184 Ariz. 46, 61 (1995). Because the superior court "is in the best position to balance the probative value of challenged evidence against its potential for unfair prejudice," the court has broad discretion in this decision. *State v. Harrison*, 195 Ariz. 28, 33, ¶ 21 (App. 1998), *aff'd*, 195 Ariz. 1 (1999). We will not find an abuse of discretion unless Roberts demonstrates prejudice. *See State v. Barreras*, 181 Ariz. 516, 520 (1995).

**¶20** The court informed the jury of Jane's absence for the sole purpose of explaining why she was not testifying. It instructed the jury that Roberts was not responsible for Jane's death and "not to consider her death as any indication of the defendant's guilt or innocence." The instruction was clear, and "we presume jurors follow the court's instructions." *State v. Newell*, 212 Ariz. 389, 403, ¶ 69 (2006). On this record, because Roberts failed to demonstrate prejudice and we presume the jury followed the court's instructions, any possible error in informing the jury about Jane's death was harmless. *See State v. Hausner*, 230 Ariz. 60, 78, ¶ 71 (2012) (finding any evidentiary errors "harmless because the trial court instructed the jurors not to consider such evidence in determining if [the defendant] committed the alleged crimes").

## II. Jane's communications to the bank employees were not testimonial

**¶21** Roberts argues admitting the evidence of Jane's communications to the bank employees violated his rights under the Confrontation Clause, which guarantees a defendant the right to confront

witnesses against him. *See* U.S. Const. amend. VI; *see also* Ariz. Const. art. 2, § 24. The clause prohibits the admission of "[t]estimonial statements of witnesses absent from trial" unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 36, 59 (2004). Statements are testimonial when the "primary purpose . . . is to establish or prove some past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822 (2006). "Non-testimonial statements are not subject to a confrontation challenge." *State v. Fischer*, 219 Ariz. 408, 418, ¶ 37 (App. 2008).

**¶22**     The statements at issue are: "call the cops," mouthed by Jane to the teller; Jane's affirmative head nod in response to the teller repeating the words "call the cops;" Jane's affirmative head nod in response to the manager's written question asking if she was in danger; and Jane's affirmative head nod in response to the manager's written question whether Roberts had a gun. Roberts argues these statements are "testimonial in nature" because "[d]eliberately alerting bank tellers in a bank lobby that you want the police to respond and that someone has a gun will undoubtedly later be used to charge a crime."

**¶23**     In *Davis v. Washington*, the Supreme Court held the declarant's statements were non-testimonial when she "was seeking aid, not telling a story about the past." 547 U.S. at 831. The Court reasoned that a declarant's statements describing "current circumstances" during a 911 call and requesting police assistance cannot be testimonial when they are "not designed primarily to 'establis[h] or prov[e]' some past fact." *Id*. at 827. In other words, statements about events as they are actually happening differ from those describing past events for purposes of the Confrontation Clause. *See id.* ("Although one *might* call 911 to provide a narrative report of a crime absent any imminent danger, [declarant's] call was plainly a call for help against bona fide physical threat."); *see also State v. Hill*, 236 Ariz. 162, 166, ¶ 12 (App. 2014).

**¶24**     Like the declarant in *Davis*, Jane was seeking help from the bank employees. The primary purpose of her statements was to enable the bank employees to meet an ongoing emergency. She was neither acting as a witness nor testifying. *See Davis*, 547 U.S. at 828. Under these circumstances, we cannot conclude that the primary purpose of Jane's mouthed words and head nods was to "create[e] an out-of-court substitute for trial testimony." *Ohio v. Clark*, 576 U.S. 237, 245 (2015) (citation omitted). Jane's statements therefore do not implicate the Confrontation Clause. *See Fischer*, 219 Ariz. at 418, ¶ 37.

**CONCLUSION**

¶25      We affirm.



AMY M. WOOD • Clerk of the Court
FILED:    AA