906 P.2d 542

**STATE of Arizona, Appellee,**

v.

**Robert Wayne MURRAY, Appellant.**

**STATE of Arizona, Appellee,**

v.

**Roger Wayne MURRAY, Appellant.**

**Nos. CR–92–0440–AP, CR–92–0441–AP.**

Supreme Court of Arizona,
En Banc.

Oct. 26, 1995.

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, Linda L. Knowles, Assistant Attorney General, Michael A. Edwards, Former Assistant Attorney General, Phoenix, for Appellee.

Harriette P. Levitt, Tucson, for Robert Wayne Murray.

Carla G. Ryan, Tucson, for Roger Wayne Murray.

**OPINION**

MOELLER, Vice Chief Justice.

**JURISDICTION**

This is a capital case in which we review the convictions and sentences of two brothers, Robert and Roger Murray, who were ages 26 and 20, respectively, at the time of the crimes. Each was convicted of two counts of first degree murder and one count of armed robbery. Appeal to this court is automatic on the capital counts and defendants have appealed their armed robbery convictions separately. Ariz.R.Crim.P. 31.2(b). We have jurisdiction pursuant to Ariz.Rev.Stat.Ann. (A.R.S.) §§ 13–4031 (1989) and 13–4033 (1989 and Supp.1994).

The brothers were tried together and have appealed separately. The facts and many of the legal issues, however, are common to both appeals. Accordingly, we issue a joint opinion resolving both cases on appeal. We first address the issues common to both and then separately address those issues presented by one, but not both, of the defendants. We affirm.

**FACTS**

**I. The Crimes**

Dean Morrison, age 65, and Jacqueline Appelhans, age 60, lived at and ran a store and restaurant at Grasshopper Junction, a rural area outside Kingman, Arizona. An acquaintance, LaVern Raduenz, stopped by their place at about 8:30 or 9:00 a.m. on May 14, 1991, to have coffee. Raduenz noticed money on the ground and an open door to the restaurant. Through the open door, he saw that the cash register was not in its usual place. Raduenz then walked over to the house, found its door open, and saw the bodies of Morrison and Appelhans. Raduenz left immediately to call the police.

Meanwhile, sometime before 8:00 a.m. and before the discovery of the bodies, police found one of Morrison's tow trucks abandoned on I–40 westbound near Kingman. At approximately 8:00 a.m. police arrested defendants on unrelated charges nearly on the other side of the state on eastbound I–40 near Holbrook. Upon their arrest, defendants had in their possession firearms and other evidence linking them to Grasshopper Junction.

When Morrison's and Appelhans' bodies were found, they were both lying face down in the living room wearing bathrobes. Both had suffered multiple gunshot wounds to the head. There was a revolver on the couch and a .22 semiautomatic rifle leaning against the wall, muzzle down. Various .22 and .38 caliber bullets, casings, and shells were found near the bodies, as well as shotgun pellets. No double ought buckshot or expended shotgun shells were found at the scene.

Drawers in the living room had been pulled open and the contents strewn around; the bedrooms and kitchen were ransacked. One of the two cushion coverings was missing from the couch. There was a .303 rifle on a bed and $172 on a desk chair. Loose change and a single roll of coins were on the kitchen floor. Morrison's wallet, undisturbed in the pocket of his pants on the kitchen floor, contained $800.

The drawer from the store's cash register had been removed. Packs of Marlboro cigarettes were left in paper bags in the store, and the gasoline register was turned on. Police found Morrison's glasses, a flashlight, and a set of keys on the patio of the store. Three live .38 caliber bullets were found near the gas pumps. Morrison's sister found a fired .25 bullet in the pantry two weeks after the crime.

Detective Lent of the Mohave County Sheriff's Department documented the tracks around the scene, noting the tracks of those officers at the scene as well as those of Raduenz. Lent and another experienced tracker, Sergeant Bishop, found four sets of footprints not made by the officers or by Raduenz, two of which were those of the victims. The other two sets of footprints were made by a pair of tennis shoes, later determined to match those worn by Roger, and by a pair of western boots, consistent with those worn by Robert at the time of his arrest. Officers photographed and sketched the footprints. Other than the shoe prints of the officers, the victims, and Raduenz, the defendants' footprints were the only ones to enter or leave the crime scene. One trail showed three sets of prints: the tennis shoes, the boots, and Morrison's slippers. The prints indicated resistance by Morrison.

Rolled and loose coins were found in the courtyard amidst footprints of the victims and defendants. Both defendants' footprints, as well as Morrison's, were found near a backhoe, where there were also tire tracks later determined to be from the tow truck found on westbound I–40.

Defendants eventually headed eastbound on I–40 in their white 1988 Ford Tempo sedan with Alabama plates. For reasons unrelated to the homicide and not disclosed to the jury, an officer attempted to stop defendants. Defendants fled in their car, speeding in excess of 85 miles per hour, leaving the highway, running a manned and armed roadblock, and only stopping offroad where a wash prevented the car from proceeding further. Robert, the driver, threw from the car a .38 revolver that contained four bullets; Roger threw out a loaded .25 semiautomatic pistol. Robert had two spent shotgun shell casings in his hip pocket.

Inside the vehicle, there was a loaded twelve gauge sawed-off shotgun along with live double ought buckshot shells. There was also a checkered cushion cover, matching the cushion on Morrison's couch, which contained rolled coins stamped "Dean's Enterprises, Grasshopper Junction, Kingman, Arizona, 86401," along with a blue pillow case containing approximately $1400 in coin rolls and $3300 in cash. Gloves were found, as well as a receipt from the Holiday House Motel in Kingman, dated May 12, 1991. Motel records showed that the brothers had listed a 1988 Ford on the hotel registration card and had checked out on May 13. A road atlas in the car had circles around the locations of two rural shops or restaurants—Oasis and Grasshopper Junction—that were not otherwise indicated on the map.

Keys recovered from Robert's pocket were later determined to fit a 1991 Chevy Pickup that was on Morrison's property. A scanner and connecting knob found in the car fit the empty bracket of the tow truck found on westbound I–40.

Morrison's autopsy revealed that he had suffered a shotgun blast that entered behind his left ear from a distance of about three feet, shattering his skull. He also suffered

two gunshot wounds from a large caliber pistol, one entering the left lower neck, and the other the right temple area. A .38 bullet was recovered from the back of his neck. Large caliber buckshot was removed from his head. A fired .38 bullet was found next to Morrison. Morrison also had lacerations and abrasions on his face, elbow, forearm, knee, and thigh. These injuries occurred in the same time frame as the gunshot wounds.

Appelhans was shot with at least three different guns. Her head had been shattered by a contact wound from a shotgun; brain and scalp tissue were found on the couch and the surrounding area. Two .38 caliber slugs were removed from her skull. She also suffered .22 caliber wounds that entered at the back of the neck and exited her face. A fragment of one of the .22 bullets was found in her right hand. An aspiration hemorrhage in her lungs suggested a lapse of time between the initial gunshot and death. The .38 caliber bullets were a possible cause of death, the .22 bullets had an uncertain role, and the shotgun blast was clearly lethal. But the autopsy did not reveal the sequence of the shots.

The casings found at the crime scene and in Robert's pocket were fired by the three guns found with defendants. Other bullets, slugs, and casings were inconclusive as to the weapons that fired them; some had characteristics that were consistent with being fired by the weapons.

Human blood and tissue were found on Robert's shirt, on Roger's pants, and on the cushion cover. The blood on Roger's pants could have come from either victim or Robert, but not from Roger. The blood on Robert's shirt could have come from either victim, but not from Robert or Roger. The blood on the cushion could have come from Appelhans, but not Morrison, Robert, or Roger. DNA tests were not conducted.

Defendants were each indicted and found guilty of the first degree murders of Morrison and Appelhans and the armed robbery of Morrison. The first degree murder verdicts were unanimous on both premeditated and felony murder theories.

## II. The Sentencings

The trial court found beyond a reasonable doubt three statutory aggravating circumstances as to each defendant: (F)(5) pecuniary gain, (F)(6) especially heinous, cruel or depraved, and (F)(8) multiple homicide. *See* A.R.S. § 13–703(F) (amended 1993). In the case of each defendant, the trial court found insufficient mitigation to warrant leniency.

## TRIAL ISSUES RAISED BY BOTH DEFENDANTS

### I. Jury Selection

#### A. Improper Master List

Contrary to A.R.S. § 21–301(B) (Supp. 1994), the original master jury list was composed only of licensed drivers and did not include registered voters. Several days before the trial was to start and after hearing testimony from the court clerk who serves as jury commissioner, A.R.S. § 21–131(A) (Supp.1994), the trial court ordered that a new jury list be created using both lists. The trial court continued the upcoming trial date one day. The jury commissioner advised the court that she could provide adequate potential jurors from the new list by then, although the forms mailed to the new jurors would place the outer deadline of returning the questionnaires a few days after the new trial date. The court's order requiring the jury venire to include registered voters as well as those licensed to drive resolved the statutory violation in the original jury pool.

■ Defendants first argue that the short response time led to fewer venire persons from the more remote areas of the county. Second, they contend that, since the drivers' license list was one-and-one-half years old, it contained fewer young people than it would have had the list been more current. Since defendants are from a small rural area of Alabama and are young, they contend they were denied a jury of their peers. This speculation, however, is unsupported by the record.

■ Defendants have not shown that they lacked a fair and impartial jury or that they were prejudiced by the procedure that was

used. *See State v. Mahoney*, 106 Ariz. 297, 302, 475 P.2d 479, 484 (1970), *cert. denied,* 401 U.S. 917, 91 S.Ct. 898, 27 L.Ed.2d 818 (1971); *State v. Miller*, 135 Ariz. 8, 12, 658 P.2d 808, 812 (App.1982). Even use of voter registration lists alone is not constitutionally infirm without showing that compiling lists in this manner systematically excluded a cognizable group of potential jurors and caused prejudice to the defendant. *State v. Gretzler,* 126 Ariz. 60, 77, 612 P.2d 1023, 1040 (1980); *State v. Brierly,* 109 Ariz. 310, 321, 509 P.2d 203, 214 (1973).

Defendants have not shown they were denied their right to a jury selected from a fair cross-section of the community. Defendants failed to show (1) the group alleged to be excluded is a "distinctive" group in the community, (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community, and (3) the underrepresentation was due to systematic exclusion of the group in the jury selection process. *See Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979). Defendant has a high burden of showing a distinctive group. *State v. Atwood,* 171 Ariz. 576, 622, 832 P.2d 593, 639 (1992), *cert. denied,* 506 U.S. 1084, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993). Defendants failed to show that any one of the three prongs of *Duren* was satisfied. No cognizable group was excluded due to the procedure. *See State v. Jordan,* 171 Ariz. 62, 66, 828 P.2d 786, 790 (App.1992) (defining cognizable group). No statistical evidence was presented to satisfy the second prong. Nor did defendants show that the exclusion was systematic. *See Atwood,* 171 Ariz. at 622, 832 P.2d at 639 ("We hold ... that defendant's reliance on isolated, subjective observations of alleged underrepresentation is insufficient to support his [constitutional] claim.").

■ The court's order requiring the jury venire to include registered voters as well as those licensed to drive resolved the statutory violation in the original jury pool. In any event, failure to follow statutory procedures is harmless, absent some separate showing of prejudice or discrimination. "A judgment of conviction will not be reversed for disregard-

ing formal provisions of the law regarding the manner and selection of juries if a fair and impartial jury was secured." *State v. McGee,* 91 Ariz. 101, 109, 370 P.2d 261, 266, *cert. denied,* 371 U.S. 844, 83 S.Ct. 75, 9 L.Ed.2d 79 (1962).

**B. Procedure Used in Dismissal from Jury Pool**

■ Defendants argue that the jury commissioner excluded jurors without any guidelines or standards, thus violating defendants' constitutional rights. A.R.S. § 21–315 (1990) gives the jury commissioner authority to excuse individuals from the qualified jury list "[w]here a person's answers to a questionnaire indicate that he is unqualified for jury service or, in the opinion of the jury commissioner, state grounds sufficient to be excused from jury service."

In a pretrial hearing, the jury commissioner testified regarding the procedures she used in selecting the jury pool. She sent out 9800 questionnaires from the master jury list (in a county with a population of 100,000), receiving less than half in return. Other than noncitizens and convicted felons, those who were dismissed were "judgment calls." The presiding judge of the superior court had delegated the responsibility of excusing jurors to her. The questionnaire did not ask about race, nationality, or place of origin. Based on the answers in the questionnaire, she excused those who were elderly and could not serve or those who had small children and were unable to get babysitters. Those who returned the questionnaire and did not ask to be excused were determined to be qualified jurors who could be randomly selected for telephone contact the day before a particular trial was to begin. The commissioner called people at work and at home during daytime hours. For this particular trial, the commissioner intended to call about 150 potential jurors. Those without telephones were not notified, and messages were not left on machines.

A.R.S. § 21–331(A) (1990) requires prospective jurors to be summoned by giving personal notice, by leaving written notice at their residence, or by mail. Defendants argue that excluding those without phones and

not providing written notice is a statutory violation because it amounts to systematic exclusion of the poor who cannot afford telephones.

These procedures do not deny defendants their right to a jury drawn from a cross section of the community. *See Atwood,* 171 Ariz. at 623, 832 P.2d at 640 ("Although some prospective jurors were excused by the Commissioner's office due to hardship, defendant was still afforded an ample pool from which to select a fair and impartial jury."). The jury commissioner properly exercised her discretion in excusing potential jurors, *id.,* and properly used the telephone to give personal notice to potential jurors, *State v. Mojarro Padilla,* 107 Ariz. 134, 137, 483 P.2d 549, 552 (1971), *cert. denied,* 404 U.S. 1049, 92 S.Ct. 718, 30 L.Ed.2d 740 (1972). "Granting excuses based on the application of neutral criteria to prospective jurors' individual situations does not constitute systematic exclusion." *State v. Sanderson,* 182 Ariz. 534, 539, 898 P.2d 483, 488 (App.1995).

### C. *Batson* Motion

■ The state struck the only Hispanic members of the jury panel, Ms. Pethers and Mr. Alvarado. *Batson* objections were made and denied by the trial court. *See Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The trial court's decision is entitled to deference and will not be set aside unless clearly erroneous. *Sanderson,* 182 Ariz. at 540, 898 P.2d at 489.

The trial court accepted that defendants had made a prima facie case of discriminatory challenges. *See United States v. Childs,* 5 F.3d 1328, 1337 (9th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1385, 128 L.Ed.2d 60 (1994). Accordingly, the trial court required the prosecutor to articulate a race-neutral reason for the strikes. *Purkett v. Elem,* — U.S. —, —, 115 S.Ct. 1769, 1770, 131 L.Ed.2d 834 (1995).

■ In the most recent ruling on the subject, the United States Supreme Court established a three-prong inquiry for *Batson* objections: (1) the opponent of the strike must establish a prima facie case of racial discrimination; (2) the proponent then must give a race-neutral explanation; (3) if a race-neutral reason is tendered, the trial court must determine "whether the opponent of the strike has proved racial discrimination." *Id.* — U.S. at — – —, 115 S.Ct. at 1770–71. Regarding the second prong, the Supreme Court concluded that the inquiry "does not demand an explanation that is persuasive, or even plausible ... [T]he issue is the facial validity of the prosecutor's explanation." *Id.* at —, 115 S.Ct. at 1771. If the reason given does not reveal a discriminatory explanation, it will be deemed race neutral. *Id.* Not until the third step does the persuasiveness of the explanation become relevant— implausible or fantastic pretexts will probably result in a finding of purposeful discrimination. *Id.*

■ The prosecutor explained that he struck Ms. Pethers because his office had recently conducted a criminal investigation of her brother and mother. He was worried about her potential bias against the state due to criminal action taken against her relatives. This is a sufficient reason to peremptorily challenge a juror. *See State v. Rodarte,* 173 Ariz. 331, 333–35, 842 P.2d 1344, 1346–48 (App.1992) (accepting a somewhat similar explanation for peremptorily striking a juror); *State v. Bailey,* 160 Ariz. 277, 281, 772 P.2d 1130, 1134 (1989) (potential juror was previously convicted of misdemeanor assault, was indicted for burglary, and requested to be excused).

■ Mr. Alvarado was dismissed because "[h]e is too nice [and] indecisive," perceptions formed by the prosecutor in a social setting years before, rather than just during voir dire. In *State v. Cruz,* we analyzed a somewhat similar explanation by the prosecutor, finding that such an explanation should be viewed with skepticism. 175 Ariz. 395, 399, 857 P.2d 1249, 1253 (1993). Before *Purkett,* we held in *Cruz* that where the explanation is facially neutral yet wholly subjective, there must be some form of objective verification. *Id.* "In appropriate cases, the objective verification could be the trial court's own observations, made on the record, which might show that the prosecutor's subjective conclusion was an appropriate reason for a facially neutral peremptory challenge." *Id.*

Assuming, without deciding, that *Cruz* is undiluted by the Supreme Court's recent ruling in *Purkett*, it nevertheless is satisfied here. Because the prosecutor's explanation was based on prior contact with the venire member outside the jury setting, his determination was not "wholly subjective" in the nature described in *Cruz*. *Id.* In addition, the trial court's own observations provided *Cruz*-type objective verification, the judge stating that based on his "own opinions about those particular jurors ... the reasons given by the State are sufficient ... [and] consistent with my own assessments of those particular jurors." We find no abuse of discretion in the trial court's ruling and accept the prosecutor's reasons as race neutral.

## II. Pretrial Motions

### A. Severance

The trial court denied each defendant's request for a trial severance.[1] Although there is some possibility of confusion in a joint trial, in the interest of judicial economy, joint trials are the rule rather than the exception. *United States v. Camacho*, 528 F.2d 464, 470 (9th Cir.), *cert. denied*, 425 U.S. 995, 96 S.Ct. 2208, 48 L.Ed.2d 819 (1976). A trial court's decision to grant or deny a severance will not be disturbed absent an abuse of discretion. *State v. Cruz*, 137 Ariz. 541, 544, 672 P.2d 470, 473 (1983). A clear abuse of discretion is established only when a defendant shows that, at the time he made his motion to sever, he had proved that his defense would be prejudiced absent severance. *Atwood*, 171 Ariz. at 612, 832 P.2d at 629. When a defendant challenges a denial of severance on appeal, he "must demonstrate compelling prejudice against which the trial court was unable to protect." *Cruz*, 137 Ariz. at 544, 672 P.2d at 473.

The trial court shall sever the trial when it "is necessary to promote a fair determination of the guilt or innocence of any defendant of any offense." Ariz.R.Crim.P. 13.4(a). Severance will also be granted if the court detects the presence or absence of unusual features of the crime or cases that might prejudice the defendant. *See State v.*

*McGill*, 119 Ariz. 329, 331, 580 P.2d 1183, 1185 (1978). Prejudice occurs when (1) evidence admitted against one defendant is facially incriminating to the other defendant, (2) evidence admitted against one defendant has a harmful rub-off effect on the other defendant, (3) there is significant disparity in the amount of evidence introduced against the defendants, or (4) co-defendants present antagonistic, mutually exclusive defenses or a defense that is harmful to the co-defendant. *State v. Grannis*, 183 Ariz. 52, 58–59, 900 P.2d 1, 7–8 (1995).

Defendants failed to show prejudice. The evidence implicated both defendants equally. Neither defendant made a statement, testified at trial, or presented an antagonistic defense. *Cf. Bruton v. United States*, 391 U.S. 123, 124, 88 S.Ct. 1620, 1621, 20 L.Ed.2d 476 (1968) (confession by co-defendant). Moreover, the jury questionnaire inquired into whether the venire members would have trouble keeping the defendants separate during trial. Those who answered affirmatively were individually questioned by the court and counsel. At the close of the evidence, the trial court instructed the jury:

> You are instructed that you must consider the evidence presented by the State separately as to each of the defendants in this case. You must determine whether or not the State has proved the charges against each defendant beyond a reasonable doubt. If you find that the State has proved its case against one of the defendants but not the other, you must reflect that in your verdict.

With such an instruction, the jury is presumed to have considered the evidence against each defendant separately in finding both guilty. *See Parker v. Randolph*, 442 U.S. 62, 73, 99 S.Ct. 2132, 2139, 60 L.Ed.2d 713 (1979). The trial judge committed no error in denying the motions to sever. "[I]n cases where the crimes of the two defendants are so intertwined that it is difficult, if not impossible, to separate proof of one defendant's crimes from that of the co-defendant's, it would be a waste of resources to require individual trials." *State v. Wiley*, 144 Ariz.

---

1. After jury verdicts found the defendants guilty, the sentencing hearings were bifurcated.

525, 532, 698 P.2d 1244, 1251 (1985), *overruled on other grounds by State ex rel. Criminal Div. of Attorney Gen.'s Office v. Superior Court ex rel. Maricopa County*, 157 Ariz. 541, 760 P.2d 541 (1988).

## B. Change of Venue Due to Pretrial Publicity

The trial court denied defendants' pretrial motion for change of venue based on pretrial publicity, stating that defendants had not met their burden of proof. The motion was renewed after voir dire and again denied.

■■■■■ A trial court's ruling on a motion for change of venue based on pretrial publicity is a discretionary decision and will not be overturned absent an abuse of discretion and prejudice to the defendant. *State v. Salazar*, 173 Ariz. 399, 406, 844 P.2d 566, 573 (1992), *cert. denied*, 509 U.S. 912, 113 S.Ct. 3017, 125 L.Ed.2d 707 (1993). There is a two-step inquiry for pretrial publicity: (1) did the publicity pervade the court proceedings to the extent that prejudice can be presumed?; if not, then (2) did defendant show actual prejudice among members of the jury? *State v. Stokley*, 182 Ariz. 505, 513, 898 P.2d 454, 462 (1995). The defendant has the burden of showing prejudice. *State v. Bible*, 175 Ariz. 549, 564, 566, 858 P.2d 1152, 1167, 1169 (1993), *cert. denied*, — U.S. —, 114 S.Ct. 1578, 128 L.Ed.2d 221 (1994); Ariz.R.Crim.P. 10.3(b).

### 1. Presumed Prejudice

■■■■■ For a court to presume prejudice, defendant must show "pretrial publicity so outrageous that it promises to turn the trial into a mockery of justice or a mere formality." *Bible*, 175 Ariz. at 563, 858 P.2d at 1166. To reach a conclusion on presumed prejudice, we review the entire record, without regard to the answers given in voir dire. *Id.* at 565, 858 P.2d at 1168.

■■■■ Defendants did not meet their burden of proof to show that "the publicity has been so extensive and so prejudicial as to create the probability that [they] will be denied a fair trial." *State v. Smith*, 116 Ariz. 387, 390, 569 P.2d 817, 820 (1977). Defendants called a news reporter and investigator as witnesses before trial to attempt to show

that pretrial publicity prejudiced defendants because various people in the community had formed opinions about their guilt or innocence. However, they failed to show *what* pretrial publicity was so outrageous, resulting in a trial that was "utterly corrupted." *Murphy v. Florida*, 421 U.S. 794, 798, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975).

Roger also cites "law enforcement overreacting" as "creating a contaminated atmosphere." The court went to great effort to shield the jurors from security measures, including requiring law enforcement officers to dress in plainclothes and transporting defendants at times when jurors were not likely to be present. It is unclear from the record whether any jurors actually observed defendants being transported in custody or while shackled. If there was any such exposure it was brief and inadvertent, not resulting in prejudice. *See State v. Apelt*, 176 Ariz. 349, 361, 861 P.2d 634, 646 (1993), *cert. denied*, — U.S. —, 115 S.Ct. 113, 130 L.Ed.2d 59 (1994). After a review of the entire record, we conclude that prejudice cannot be presumed.

### 2. Actual Prejudice

■■■■ The relevant inquiry for actual prejudice is the effect of the publicity on the objectivity of the jurors, not the fact of the publicity itself. *Bible*, 175 Ariz. at 566, 858 P.2d at 1169. Defendants did not show that the jurors had "formed preconceived notions concerning the defendant[s'] guilt and that they [could not] lay those notions aside." *State v. Chaney*, 141 Ariz. 295, 302, 686 P.2d 1265, 1272 (1984). Although some of the prospective jurors had heard about the case, the jury questionnaire and the individual voir dire by both the judge and defense counsel thoroughly probed the issue of publicity. Only those prospective jurors who indicated that they could set aside the publicity and decide the case on the evidence presented remained on the jury panel. *See Atwood*, 171 Ariz. at 632, 832 P.2d at 649. The empaneled jury was warned repeatedly to avoid media coverage of the trial. Defendants failed to show actual prejudice.

## C. Hybrid Representation

[21, 22] Hybrid representation involves concurrent or alternate representation by both defendant and counsel. *Montgomery v. Sheldon*, 181 Ariz. 256, 260–61, 889 P.2d 614, 618–19 (1995). Although the trial court has discretion to permit hybrid representation, there is no constitutional or other right to hybrid representation. *Id.* at 260, 889 P.2d at 618; *State v. Rickman*, 148 Ariz. 499, 504, 715 P.2d 752, 757 (1986).

### 1. Robert

■ Robert filed a "Motion to Proceed in Proper Person, and Appointment of Co–Counsel and Investigator" on January 2, 1992, citing "the delayed state of the case, and its magnitude," as well as the relocation of his appointed counsel to Tucson.

At the hearing, Robert stated,

Your Honor, I feel that due to the—it's been eight months since this thing's started, and it's been dragging around in my opinion. I don't ask the court to proceed by myself as pro per, but as primary counsel, a co-counsel appointed from the legal defender's office to assist me in this thing, you know ... [I]t might be ... better ... to have more control.

The State argued that hybrid representation was not allowed and stated that Robert should not have access to the county law library because of a letter he wrote to Roger stating he would escape given the chance.

The court stated,

You are entitled to represent yourself if that's what you choose, and, of course, if the Court finds that you're competent to represent yourself.... But, you are not entitled to have a co-counsel. The Court, if you decide to represent yourself, will probably appoint you an advisory counsel.... [Y]ou will not be allowed out of jail to do any sort of research.... So, you need to tell me what your position is on whether you want to represent yourself, or if you are willing to stay with the attorney that you have got, or if you want another attorney.

Robert responded, "Under those terms, I would attempt to be satisfied with another attorney appointed from the legal defender's office."

After having a lawyer from the legal defender's office speak about her willingness to take on the case and the time limitations she would face, the court directed Robert to discuss the matter with both the appointed lawyer and the potential replacement lawyer. Robert stated that he did not object to the proposed procedure.

There is no transcript for the continuation of the hearing that afternoon. However, the hearing transcript shows that during the afternoon session, the appointed lawyer made a statement, Robert made statements agreeing with the appointed lawyer, and the trial court ordered the county legal defender's office to serve as local counsel, with the appointed lawyer to remain as counsel of record.

The factors listed in *State v. LaGrand*, 152 Ariz. 483, 486–87, 733 P.2d 1066, 1069–70, *cert. denied*, 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987), are not present here (e.g., irreconcilable conflict, proclivity of defendant to change counsel, quality of counsel). Defendant agreed to the arrangement proposed by the trial court. The trial judge did not abuse his discretion by denying hybrid representation.

### 2. Roger

■ Roger, through his attorney, filed a motion on July 2, 1991, to join as co-counsel to his defense, which was rejected by the court. On August 20, 1992, after the trial but before sentencing, Roger wanted to fire his attorneys based on a conflict of interest. The court ordered that the public defender withdraw as counsel but remain as advisory counsel. One week later, Roger filed a motion to appoint counsel because of lack of access to legal materials. At the hearing, the judge heard from counsel about irreconcilable differences and a potential conflict regarding a witness to be called by Robert. After discussion, the court reappointed the lawyers who had been representing him. The trial court did not abuse its discretion by denying Roger's motion for hybrid representation.

### D. Access to Library

[25, 26] Both defendants filed motions to gain access to legal materials and the county law library, which the trial court denied. In *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977), the Supreme Court held that the constitutional right of access to the courts requires the state to provide "adequate law libraries *or* adequate assistance from persons trained in the law." (emphasis added). *See also Findlay v. Lewis,* 172 Ariz. 343, 346, 837 P.2d 145, 148 (1992) (citing *Bounds* ); *Knight v. Superior Court,* 161 Ariz. 551, 555, 779 P.2d 1290, 1294 (App.1989) ("[W]hen an inmate is denied access to a law library for security or other reasons, and when alternative means are satisfied by his having the assistance of persons trained in the law, the court need not order direct library access."); *Berry v. Department of Corrections,* 144 Ariz. 318, 320–21, 697 P.2d 711, 713–14 (App.1985) ("Neither *Bounds* nor its progeny requires that every state correctional facility and every county and city jail provide access to an extensive law library."). Because defendants were provided with either advisory counsel or counsel throughout their proceedings, their constitutional right to court access was met, regardless of whether they had personal access to legal materials. *See State v. Henry,* 176 Ariz. 569, 584, 863 P.2d 861, 876 (1993).

## III. Evidentiary Issues

### A. Gruesome Photographs

Roger and Robert both moved pretrial to exclude all photographic evidence. When that was denied, they moved to substitute black-and-white photos for color photos of the victims. That motion also was denied, the trial court noting that it did not find the photos "out of line," that they were relevant and not unduly prejudicial. At trial, both defendants objected to photographic exhibits 71, 75, 87, 92, and 197 on grounds of prejudicial effect and cumulative nature. Robert also objected to photographic exhibits 89 and 99, although Roger did not and has therefore waived any error in their admission. *See State v. Thomas,* 130 Ariz. 432, 435, 636 P.2d 1214, 1217 (1981). The trial court overruled all the objections.

Exhibit 71 is a color photo of the victims, lying on their stomachs on the living room floor, blood apparent in the head and neck area of Morrison. Exhibit 75 is a color photo of a couch with a pistol on it, with red and white tissue fragments splattered on the cushions. Exhibit 87 shows a table leg, still attached to the table, with apparent scalp hair of Appelhans hanging from the leg and a bone fragment on the carpet. Exhibit 89 is a color photo of the door frame area with red spots splattered on the wall, door, and frame. Exhibit 92 shows Appelhans' head, with the scalp blown away, exposing the brain, with red tissue, bone matter, and blood in the area. Exhibit 99 is a color photo of the couch, one of the cushions out of place, with what appears to be red tissue splattered on the couch and nearby table. Exhibit 197 is a color photo of the back of the two victims' heads, Appelhans' hand clutching the arm of Morrison, blood on her fingers, blood on Morrison's ear, and blood on the floor. A denture from one of the victims is on the floor in the middle of the photo.

■ The admission of photographs requires a three-part inquiry: (1) relevance; (2) tendency to incite passion or inflame the jury; and (3) probative value versus potential to cause unfair prejudice. *Stokley,* 182 Ariz. at 515, 898 P.2d at 464; *see* Ariz.R.Evid. 401–03. The photographs are relevant if they aid the jury in understanding an issue. Ariz. R.Evid. 401; *State v. Moorman,* 154 Ariz. 578, 586, 744 P.2d 679, 687 (1987). If the trial court finds that the photographs address contested issues and that they have more than technical relevance, the trial court may admit them notwithstanding a tendency to create prejudice. *State v. Chapple,* 135 Ariz. 281, 288, 660 P.2d 1208, 1215 (1983). We analyze a trial court's decision on admission of photographs on an abuse of discretion standard. *State v. Amaya–Ruiz,* 166 Ariz. 152, 170, 800 P.2d 1260, 1278 (1990), *cert. denied,* 500 U.S. 929, 111 S.Ct. 2044, 114 L.Ed.2d 129 (1991).

■ While exhibit 92, showing Appelhans' head and brain tissue, is arguably inflammatory, it addressed a contested issue. Robert contended that the state did not do a

proper investigation, in particular, that lab tests were not conducted on the debris in the room. The state then introduced, over objection, the photo exhibit and the trial court admitted it on the ground that it was fair rebuttal to the cross-examination of Detective Lent. The other photographs were relevant to identifying the victims, their locations, and the manner in which they were killed. *Id.* at 171, 800 P.2d at 1279 ("In prosecuting a crime of this nature, the state must be allowed some latitude to show what actually occurred."). The trial court did not abuse its discretion in admitting the photographs. *See State v. Lopez*, 174 Ariz. 131, 139, 847 P.2d 1078, 1086 (1992), *cert. denied*, — U.S. —, 114 S.Ct. 258, 126 L.Ed.2d 210 (1993).

### B. Footprint Comparisons

■■■ Defendants argue that the evidence of footprint comparisons was improperly admitted because Detective Lent was not qualified as an expert. Footprint comparisons are a proper subject of expert testimony in a criminal prosecution. *State v. Runningeagle*, 176 Ariz. 59, 69, 859 P.2d 169, 179, *cert. denied*, — U.S. —, 114 S.Ct. 609, 126 L.Ed.2d 574 (1993). "Whether a witness is competent to testify as an expert is a matter primarily for the trial court and largely within its discretion." *Salazar*, 173 Ariz. at 407, 844 P.2d at 574.

Lent's qualifications and background included extensive tracking in criminal investigations, qualifying in both federal and state courts as an expert, tracking livestock, military training in the examination of enemy trails, hunting, trapping, training from an experienced Department of Public Safety officer, teaching numerous classes in tracking and footprint identification, experience in training shoe and boot identification, determinations of matches on hundreds of occasions, and reading articles. *See State v. Dixon*, 153 Ariz. 151, 155, 735 P.2d 761, 765 (1987).

Rule 702, Arizona Rules of Evidence, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine

a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Under this rule, the detective's experience is sufficient to qualify him as an expert. *See Dixon*, 153 Ariz. at 155, 735 P.2d at 765 ("A witness must indicate that his training and experience qualify him to render enlightened opinions and draw sophisticated conclusions from the particular type of evidence available."); *Salazar*, 173 Ariz. at 407, 844 P.2d at 574 (police detective was competent to give expert testimony concerning details of footprints where he had received training in tracking). The trial court did not abuse its discretion in qualifying Lent as an expert. *See State v. Kelly*, 111 Ariz. 181, 188, 526 P.2d 720, 727 (1974), *cert. denied*, 420 U.S. 935, 95 S.Ct. 1143, 43 L.Ed.2d 411 (1975).

■■■ Defendants also objected based on failure to use *Frye* standards in analyzing the method used by the officers in collecting and recording the footprint evidence. *See Frye v. United States*, 293 F. 1013 (D.C.Cir. 1923), *overruled on federal law grounds by Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). However, *Frye* analysis is not applicable to footprints. *See Runningeagle*, 176 Ariz. at 69, 859 P.2d at 179.

■■■ In addition, Roger argues that the trial court's denial of his request for expenses for an out-of-state expert on footprint identification was error. Roger requested funds for several experts, including one to testify on footprint evidence. In response, the trial court authorized $3000 before trial for additional investigation and experts, for use as the defense determined. *See* A.R.S. § 13–4013(B) (1989) (indigent defendant charged with capital offense is entitled to investigator and expert witnesses deemed reasonably necessary to present defense). While the trial court provided funds for experts, the trial court did question the need to bring in a particular witness from Washington, D.C., when other experts from within Arizona or neighboring states were available. "In order to find an abuse of discretion, we must determine that the denial or restriction

of investigative funds substantially prejudiced the defendant." *State v. Clabourne,* 142 Ariz. 335, 342, 690 P.2d 54, 61 (1984). Roger has failed to show how he was prejudiced by the trial court's refusal to allocate more than $3000 for investigators and experts. *See State v. Gonzales,* 181 Ariz. 502, 511, 892 P.2d 838, 847 (1995).

▇▇▇ Roger also argues that because the sheriff's office did not use proper procedures in analyzing and preserving footprint evidence, the evidence should have been excluded. An evidentiary hearing on Roger's pretrial motion to suppress was held at which Detective Lent explained the methods he used in preserving and analyzing the footprint evidence. He admitted that he did not follow FBI procedures. The trial court concluded that Detective Lent was qualified as an expert and that the evidence of investigative methods went to weight rather than admissibility. On cross-examination at trial, Lent testified that he did not grid the area, photograph the shoes of officers, cast the prints, or use a tripod in photographing the prints. Defense called its investigator, Jack Nelson, to dispute the methods used by Detective Lent.

There is more than one way in which footprints can be preserved and analyzed. Although Detective Lent did not follow FBI procedures, this does not require exclusion of the evidence. We agree with the trial court that Detective Lent's testimony was properly admitted and that any issue of proper methodology went to the weight rather than admissibility. *See Kelly,* 111 Ariz. at 188, 526 P.2d at 727.

## C. Impeachment of Detective Lent

▇▇▇ Defendants argue that the court improperly precluded them from impeaching Detective Lent with the alleged fact that he had previously admitted to having lied under oath. On cross-examination, Roger's counsel asked Lent, "In at least one case you admit-

ted that you lied under oath?" Lent responded, "Correct." The state objected. The offer of proof was that, in a prior case, Lent admitted that he had fabricated evidence in one instance and concealed evidence in another. Defense counsel had a transcript of the testimony and a witness who was present at the previous trial. The court precluded admission of the extrinsic evidence.

▇▇▇ This question is governed by Rule 608(b), Arizona Rules of Evidence, which covers impeachment of witnesses using evidence of specific instances of conduct.[2] The rule has three requirements: (1) the conduct may not be proved by extrinsic evidence, (2) the conduct must be probative of the character of the witness for truthfulness, and (3) the trial court must exercise discretion to determine whether the probative value of the conduct is substantially outweighed by the danger of unfair prejudice, confusion, or waste of time. *State v. Lee,* 151 Ariz. 428, 430, 728 P.2d 298, 300 (App.1986). The trial court's determination is analyzed on an abuse of discretion standard. *See State v. Woods,* 141 Ariz. 446, 453, 687 P.2d 1201, 1208 (1984).

This court dealt with a similar issue involving Detective Lent in *State v. Hill,* 174 Ariz. 313, 326, 848 P.2d 1375, 1388, *cert. denied,* — U.S. ——, 114 S.Ct. 268, 126 L.Ed.2d 219 (1993), concluding that the trial court properly refused to allow impeachment by using a transcript from another proceeding.

The trial court here considered the arguments made by counsel in chambers and apparently concluded that Lent's admissions were not probative of truthfulness in that Lent never intentionally misled anyone, though he admitted to being mistaken as to things that occurred two years before. After studying the transcript, the trial court found that it was "not extremely probative of the matters before this Court ... extremely confusing and ... [the] probative value does not outweigh its unfair prejudice or its confusing aspects." The court also stated, "[Y]ou can

---

2. Rule 608(b) states:

 Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, how-

 ever, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness....

impeach him with prior lies if you can prove them and if he admits them, but we are not going to ... [try] a collateral matter." Under the rules of evidence, such determinations are for the trial court to make. *Lee,* 151 Ariz. at 430, 728 P.2d at 300. There was no abuse of discretion.

## IV. Defendants' Request for Acquittal

Both defendants moved for acquittal when the state rested, arguing that there was "no substantial evidence to warrant a conviction." *See* Ariz.R.Crim.P. 20. Robert also filed a postverdict motion for acquittal, which Roger joined. On appeal, defendants argue that the trial court erred in denying their motions.

 In *State v. Apelt,* we stated:

A judgment of acquittal is appropriate when no substantial evidence [exists] to warrant a conviction. Substantial evidence is more than a mere scintilla and is such proof that reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt.

176 Ariz. at 360, 861 P.2d at 645 (citations and quotations omitted). The probative value of evidence is not reduced because it is circumstantial. *State v. Blevins,* 128 Ariz. 64, 67, 623 P.2d 853, 856 (App.1981). When a defendant challenges the sufficiency of the evidence, an appellate court views the evidence in the light most favorable to sustaining the conviction. *State v. Tison,* 129 Ariz. 546, 552, 633 P.2d 355, 361 (1981), *cert. denied,* 459 U.S. 882, 103 S.Ct. 180, 74 L.Ed.2d 147 (1982).

### A. Armed Robbery/Felony Murder

[43] Defendants argue that the state failed to show that force was used in the course of taking property; thus, the armed robbery and felony murder charges lacked substantial evidence. *See State v. Lopez,* 158 Ariz. 258, 264, 762 P.2d 545, 551 (1988). According to them, the armed robbery charge should have resulted in acquittal. They argue that the evidence only supported a charge of theft, which is not a predicate for felony murder. Therefore, they argue, the felony murder charge should have been dismissed as well.

 A person commits armed robbery if in the course of taking property from the presence of another against his will, such person is armed with a deadly weapon and threatens or uses force with the intent to coerce the surrender of property or to prevent resistance. A.R.S. §§ 13–1902, –1904 (1989). "[T]here must be evidence establishing that defendant's intent to commit robbery was coexistent with his use of force." *Lopez,* 158 Ariz. at 263, 762 P.2d at 550 (quoting *State v. Wallace,* 151 Ariz. 362, 365, 728 P.2d 232, 235 (1986), *cert. denied,* 483 U.S. 1011, 107 S.Ct. 3243, 97 L.Ed.2d 748 (1987)). We also have stated that "a robbery may also be established when the use of force precedes the actual taking of property, so long as the use of force is accompanied with the intent to take another's property." *State v. Comer,* 165 Ariz. 413, 421, 799 P.2d 333, 341 (1990), *cert. denied,* 499 U.S. 943, 111 S.Ct. 1404, 113 L.Ed.2d 460 (1991).

Here, there is evidence that the Murray brothers took property from the store, which was not open for business. Further, there is evidence that they took the property from Morrison's immediate presence, as Morrison's flashlight, keys, and glasses were found on the porch and signs of a struggle were found in the courtyard. Loose coins were disbursed throughout the courtyard, suggesting that the defendants already had taken some property when they subdued Morrison. *See id.* ("[T]he only reasonable inference based on the evidence was that appellant shot [the victim] in furtherance of his previously formulated plan to obtain money and supplies."). Clearly, they were armed, as they were arrested a few hours later with the same weapons as those used on the victims. Thus, this case differs from *Lopez,* where there was no evidence that force was used in the course of taking property.

 Roger also claims there is no evidence that he "killed, attempted to kill or intended to kill"; therefore, the felony murder conviction is invalid. But the state need not prove that defendant "killed, attempted to kill, or intended to kill" in order to prove felony murder. *See* A.R.S. 13–1105(A)(2)

(Supp.1994). The state need only prove that defendant, either as a principal or as an accomplice, committed or attempted to commit robbery and that someone was killed in the course of and in furtherance of the robbery. *Id.;* A.R.S. § 13–303(A) (1989) (criminal liability based upon conduct of another); *see State v. Collins,* 111 Ariz. 303, 307, 528 P.2d 829, 833 (1974) (defendant could be convicted and sentenced for first degree murder and armed robbery, even though defendant did not actually shoot victim).

### B. Premeditated First Degree Murder

 Roger also argues that the finding of premeditation is insupportable because the state did not prove that he was at the scene and participated in the crime. To show premeditation, the state must prove that the defendant acted with either the intent or knowledge that he would kill his victim and that such intent or knowledge preceded the killing by a length of time permitting reflection. *State v. Rankovich,* 159 Ariz. 116, 122, 765 P.2d 518, 524 (1988). To sustain a verdict of premeditated first degree murder, there must be substantial evidence of premeditation. *State v. Dickey,* 125 Ariz. 163, 170, 608 P.2d 302, 309 (1980). Premeditation may be as instantaneous as successive thoughts of the mind. *State v. Lacquey,* 117 Ariz. 231, 234, 571 P.2d 1027, 1030 (1977).

 Here, defendants shot the victims repeatedly in the back of the head, execution style, while they lay on their stomachs. This shows that defendants had sufficient time to permit reflection. Furthermore, the evidence placing defendants at the scene was overwhelming. An atlas with Grasshopper Junction circled was found in the Ford Tempo. Defendants had spent the night of May 12 in Kingman and had visited the Temple Bar until 9:00 or 10:00 p.m. on May 13, the night of the murders. Defendants were apprehended the following morning with evidence from the crime scene, including rolled coins with the business name stamped on the roll, a cushion cover matching the couch in Morrison's living room, car keys that fit a car left at the scene, a scanner that fit into the tow truck, and guns and ammunition that matched or were consistent with bullets fired at the scene. Blood found on defendants' clothing was consistent with blood from the victims. Footprints at the scene were consistent with shoes worn by defendants. This evidence is more than enough to place defendants at the scene participating in the crimes.

### V. Special Verdict

 Defendants argue that the court failed to issue a special verdict, as required by statute. *See* A.R.S. § 13–703(D) (Supp. 1994). The special verdicts are in the record, though they are not titled "Special Verdict."

## TRIAL ISSUES: ROBERT

### I. Fair and Impartial Grand Jury

 Robert's motion to remand to the grand jury was denied. He argues that because one grand juror assisted a key witness before the grand jury in his campaign for sheriff and ten grand jurors had knowledge of the case through the media, he was denied his right to a fair and impartial grand jury. He also argues that the grand jurors were not sufficiently questioned about their exposure to media accounts.

 To obtain review of a denial of redetermination of probable cause, a defendant must seek relief before trial by special action. *State v. Gortarez,* 141 Ariz. 254, 258, 686 P.2d 1224, 1228 (1984). Absent an indictment that the state knew was partially based on perjured, material testimony, defendant may not challenge matters relevant only to the grand jury proceedings by appeal from conviction. *Id.* There is no claim of perjured testimony, and defendant is now precluded from challenging the grand jury's finding of probable cause. *State v. Charo,* 156 Ariz. 561, 566, 754 P.2d 288, 293 (1988).

## TRIAL ISSUES: ROGER

### I. Sequestration

 Defendants moved to sequester the jury during voir dire and trial, contending, at that time, that the jury would be prejudiced by the security measures to be used at trial. On appeal, Roger argues in-

stead that trial publicity required sequestration of the jury.

Sequestration of a jury is within the discretion of the trial court, Ariz.R.Crim.P. 19.4, and a trial court's ruling on the subject will not be disturbed on appeal absent a showing of an abuse of discretion and resulting prejudice to the defendant. *State v. Schad*, 129 Ariz. 557, 568, 633 P.2d 366, 377, *cert. denied*, 455 U.S. 983, 102 S.Ct. 1492, 71 L.Ed.2d 693 (1981). Any first degree murder trial is likely to require some added security around the court house. Such security does not require the court to sequester the jury.

Regarding trial publicity, the court repeatedly admonished the jury to avoid media coverage during the trial. Defendant has not shown, or even claimed, that the jurors did not follow the court's admonitions. *See Bible*, 175 Ariz. at 574, 858 P.2d at 1177. The trial court did not abuse its discretion in denying defendants' motion for sequestration of jurors.

## II. Jury Instructions

### A. *Willits* Instruction

 When the state destroys material evidence, the contents or quality of which are at issue in trial, the jury may infer that the facts are against the state's interest. *State v. Willits*, 96 Ariz. 184, 187, 191, 393 P.2d 274, 276, 279 (1964). "A *Willits* instruction is appropriate when the state destroys or loses evidence potentially helpful to the defendant." *State v. Lopez*, 163 Ariz. 108, 113, 786 P.2d 959, 964 (1990). A trial court's decision to grant or deny a requested *Willits* jury instruction is judged on an abuse of discretion standard. *Henry*, 176 Ariz. at 583, 863 P.2d at 875.

 Roger argues that the state failed to preserve evidence helpful to him, so he requested a *Willits* instruction, which was denied. The state's alleged failures include failing to estimate the time of death, failing to preserve all the potential evidence that was inside the Tempo, such as remnants from Burger King, failing to preserve evidence at the scene, including the types of all the shoes worn by others at the scene, and failing to use a tripod in photographing the scene.

 Destruction or nonretention of evidence does not automatically entitle a defendant to a *Willits* instruction. Defendant must show (1) that the state failed to preserve material and reasonably accessible evidence having a tendency to exonerate him, and (2) that this failure resulted in prejudice. *Henry*, 176 Ariz. at 583, 863 P.2d at 875.

 Roger's *Willits* instruction was properly denied because none of the allegedly unavailable evidence tended to exonerate him. *See State v. Broughton*, 156 Ariz. 394, 399, 752 P.2d 483, 488 (1988). Contrary to Roger's contentions, the time of death was estimated as between 6:15 p.m. and 9:00 a.m.; the bathrobes and flashlight indicate that the crimes occurred while it was dark. The Burger King bag was not preserved because one of the detectives determined it had no evidentiary value—there was no receipt or indication of location of purchase in the bag. The footwear of others at the scene also was determined to have no evidentiary value. *See State v. Day*, 148 Ariz. 490, 497, 715 P.2d 743, 750 (1986). Detective Lent noted the footprints attributable to those at the scene, thus photographing or otherwise recording their shoes was not necessary for later comparison. What was preserved were the suspects' footprints. A *Willits* instruction is not given merely because a more exhaustive investigation could have been made. *State v. Willcoxson*, 156 Ariz. 343, 346, 751 P.2d 1385, 1388 (App.1987). The court did not abuse its discretion in not giving a *Willits* instruction.

### B. Intoxication Instruction

 Roger argues that he was entitled to a voluntary intoxication instruction because intent is a necessary element of the crimes charged. *See* A.R.S. § 13–503 (amended 1993). Defendants had visited the Temple Bar on May 13, fifty-three miles from the crime scene. A manager at the Temple Bar testified that the two men were "handling themselves very well." The trial court found that the evidence presented did not show that the alcohol had an effect on their ability to think, function, or form intent. *See LaGrand*, 152 Ariz. at 487, 733 P.2d at

1070; *State v. Edgin*, 110 Ariz. 416, 418, 520 P.2d 288, 290 (1974); *State v. Gonzales*, 123 Ariz. 11, 12–13, 596 P.2d 1183, 1184–85 (App. 1979).

"An intoxication instruction should be given only when the record supports such an instruction." *LaGrand*, 152 Ariz. at 487, 733 P.2d at 1070. Mere proof of consumption of alcohol is insufficient for an instruction; there must be evidence that alcohol could have had an effect on defendant so as to negate an element of the crime. *See, e.g., Edgin*, 110 Ariz. at 418, 520 P.2d at 290. Defendant failed to meet this burden.

## C. Second Degree Murder Instruction

■■■■ Roger wanted a second degree murder instruction. Such an instruction would be applicable, if at all, only to the premeditated murder count, since there are no lesser included offenses of felony murder of which defendant was, in any event, convicted. *State v. LaGrand*, 153 Ariz. 21, 30, 734 P.2d 563, 572, *cert. denied*, 484 U.S. 872, 108 S.Ct. 207, 98 L.Ed.2d 158 (1987). As a general rule, however, defendant is entitled to instructions on lesser included offenses if they are supported by the evidence. *Beck v. Alabama*, 447 U.S. 625, 627, 100 S.Ct. 2382, 2384, 65 L.Ed.2d 392 (1980); *Clabourne*, 142 Ariz. at 345, 690 P.2d at 64. This is particularly so in a capital case. *See State v. Krone*, 182 Ariz. 319, 323, 897 P.2d 621, 625 (1995).

■■■■ Premeditated murder occurs if the defendant intends or knows that his acts will kill another and his intention or knowledge precedes the killing by a length of time sufficient to permit reflection. *Lopez*, 163 Ariz. at 112, 786 P.2d at 963. For a second degree murder charge, the evidence must show a lack of premeditation and deliberation. *Clabourne*, 142 Ariz. at 345, 690 P.2d at 64. "To determine whether there is sufficient evidence to require the giving of a lesser included offense instruction, the test is whether the jury could rationally fail to find the distinguishing element of the greater offense." *Krone*, 182 Ariz. at 323, 897 P.2d at 625 (internal quotation omitted) (quoting *State v. Detrich*, 178 Ariz. 380, 383, 873 P.2d 1302, 1305 (1994)). Thus, we must determine whether the jury could have rationally failed to find premeditation.

In denying the instruction, the trial court stated, "[B]ased on the physical evidence, I don't see how it can be anything other than first degree murder." We agree. "The evidence produced at trial ... did not indicate the deaths were caused by intentional, knowing, or reckless conduct, without premeditation, as prescribed by A.R.S. § 13–1104 (second degree murder)." *State v. Lamb*, 142 Ariz. 463, 472, 690 P.2d 764, 773 (1984). Defendants had the victims lie on the carpet of their living room and proceeded to shoot each of them with different weapons in the back of the head. The only inference that a jury rationally could have drawn was that defendants premeditated. *See Salazar*, 173 Ariz. at 408, 844 P.2d at 575 ("Because defendant's theory of the case denies all involvement in the killing, and no evidence provides a basis for a second degree murder conviction, the instruction was properly refused.").

## D. Prohibition of Lesser Included Offense Instruction

■■■ Roger argues that Arizona's felony murder statute unconstitutionally restricts a defendant's rights to due process and a fair jury trial because it has been construed to prohibit a lesser included instruction regarding second degree murder. The United States Supreme Court held otherwise in *Schad v. Arizona*, 501 U.S. 624, 645–48, 111 S.Ct. 2491, 2504–05, 115 L.Ed.2d 555 (1991). Felony murder, unlike premeditated murder, has no lesser included instructions. *State v. West*, 176 Ariz. 432, 443, 862 P.2d 192, 203 (1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1635, 128 L.Ed.2d 358 (1994).

## III. Request for Mistrial

■■■ Roger argues that the denial of his motion for mistrial was error. The motion was prompted by a detective's testimony that blood was drawn from each defendant by a "nurse in jail." Another officer referred to defendants being in jail when testifying about clothing taken from defendants. Roger also argues that exhibit 225, a picture of him, was prejudicial because it "suggests" that he was in custody when it was taken.

The trial court has broad discretion in ruling on a motion for mistrial, and failure to grant the motion is error only if it was a clear abuse of discretion. *State v. Stuard,* 176 Ariz. 589, 601, 863 P.2d 881, 893 (1993). In deciding whether a mistrial is required due to witness comments, the trial court must consider whether the comments caused jurors to consider improper matters and the probability that the jurors were influenced by such comments. *Id.*

Neither the comments about jail nor the photograph require a mistrial: "A declaration of a mistrial is the most dramatic remedy for trial error and should be granted only when it appears that justice will be thwarted unless the jury is discharged and a new trial granted." *State v. Adamson,* 136 Ariz. 250, 262, 665 P.2d 972, 984, *cert. denied,* 464 U.S. 865, 104 S.Ct. 204, 78 L.Ed.2d 178 (1983). The trial court's decision will be reversed only if it's "palpably improper and clearly injurious." *State v. Walton,* 159 Ariz. 571, 581, 769 P.2d 1017, 1027 (1989), *aff'd,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). Certainly the jurors were aware that defendants were arrested and had spent some time in custody prior to trial. Such knowledge is not prejudicial and does not deny defendants the presumption of innocence.

## IV. Prosecutorial Misconduct

Roger argues that prosecutorial misconduct, in the following instances, denied his right to a fair trial:

(1) A detective's joking about the Federal Bureau of Investigations while testifying. The objection to the FBI comment was sustained based on irrelevance and the jury was instructed to disregard it.

(2) Discussion by officers in the courthouse library that defendants were using the "fecal defense"—throwing up anything and hoping something sticks. The trial court thoroughly probed this issue and concluded that there had been no discussion of the evidence and that the jurors were unlikely to have heard the discussion.

(3) The prosecutor's alleged joking with a witness in front of the jury about whether a bartender at the Temple Bar had gone fishing in Mexico. Defendant waived this issue for failure to object at trial. *See State v. White,* 115 Ariz. 199, 203, 564 P.2d 888, 892 (1977).

(4) The prosecutor's joking with someone while on a cigarette break about being subpoenaed, while two jurors stood nearby. The prosecutor himself brought the incident to the court's attention; neither defendant objected or moved for a mistrial in the trial court. Thus, defendant waived this issue.

(5) In closing argument, the prosecutor's referring to defendants as "the boys from Alabama." Defendant waived this issue by failing to object at trial. *See State v. Hankins,* 141 Ariz. 217, 224, 686 P.2d 740, 747 (1984).

(6) The prosecutor's stating that a .25 caliber bullet found on the premises had been fired by one of the brothers. The argument was permissible because a ballistics expert found that the bullet matched the pistol Roger threw from the car.

(7) Reference in closing argument by the state to defendants feeling a "sick excitement" in committing the murders. The trial court cautioned the prosecutor and the prosecutor made no more such references.

In addressing allegations of prosecutorial misconduct, an appellate court must determine whether the prosecutor's actions were reasonably likely to have affected the jury's verdict, thereby denying him a fair trial. *Cornell,* 179 Ariz. at 328, 878 P.2d at 1366. Even where the prosecutor has erred, a reversal is not required unless the misconduct affected the jury's ability to judge the evidence fairly. *United States v. Sherlock,* 962 F.2d 1349, 1364 (9th Cir.1989), *cert. denied,* 506 U.S. 958, 113 S.Ct. 419, 121 L.Ed.2d 342 (1992). Defendant suffered no demonstrable prejudice in any of these instances and failed to show how any of the instances affected the jury's verdict.

## V. Visitation of the Crime Scene

 Defense counsel and two investigators were allowed to visit the crime scene in May 1991, shortly after the crimes and about one year before trial. Subsequently, a new attorney from the same public defender's office and an investigator were assigned to assist the original attorney. The new attorney and investigator never visited the crime scene. On the fourth day of trial, more than a year after the crime was committed, Roger's counsel orally moved for an order permitting the defense team to revisit the crime scene. The trial court denied the motion on the ground that defendant failed to show a substantial need for a second inspection. *See* Ariz.R.Crim.P. 15.1(e). The original attorney was still the primary counsel and the original investigators were still available. Furthermore, the crime scene had been cleaned up. The trial court did not abuse its discretion.

### SENTENCING

## I. Objective Standards and Prosecutorial Discretion

Roger argues that because there are no objective standards in determining the death penalty, it is unconstitutional. This argument has been rejected. *Salazar,* 173 Ariz. at 411, 844 P.2d at 578; *State v. Correll,* 148 Ariz. 468, 484, 715 P.2d 721, 737 (1986).

Roger also argues that the state has too much discretion in seeking the death penalty. This argument has been rejected. *State v. Harding,* 137 Ariz. 278, 292, 670 P.2d 383, 397 (1983), *cert. denied,* 465 U.S. 1013, 104 S.Ct. 1017, 79 L.Ed.2d 246 (1984).

## II. Independent Review

 This court independently reviews death sentences for error, determines whether the aggravating circumstances have been proved beyond a reasonable doubt, considers any mitigating circumstances, and then weighs the aggravating and mitigating circumstances in deciding whether there are mitigating circumstances sufficiently substantial to call for leniency. *State v. Brewer,* 170 Ariz. 486, 500, 826 P.2d 783, 797, *cert.* *denied,* 506 U.S. 872, 113 S.Ct. 206, 121 L.Ed.2d 147 (1992).

## III. Aggravating Factors

 To make a defendant death eligible, the state must prove beyond a reasonable doubt at least one statutory aggravating circumstance. A.R.S. § 13–703(E) (amended 1993); *Brewer,* 170 Ariz. at 500, 826 P.2d at 797. The trial court rendered separate verdicts for the first degree murders of each victim for each defendant. The aggravating factors were identical for both defendants regarding each victim. The trial court found that the state proved three aggravating circumstances:

A. Defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value. A.R.S. § 13–703(F)(5).

B. Defendant committed the offense in an especially heinous, cruel, or depraved manner. A.R.S. § 13–703(F)(6).

C. Defendant has been convicted of one or more other homicides which were committed during the commission of the offense. A.R.S. § 13–703(F)(8).

Robert challenges only the (F)(6) aggravating factor. Roger challenges all three aggravating factors. We address each in turn.

### 1. Pecuniary Gain

 To prove pecuniary gain, the state must show that defendants "anticipated receiving something of value as a result of the murder." *State v. Prince,* 160 Ariz. 268, 275, 772 P.2d 1121, 1128 (1989). Financial motivation must be the cause of the murder, not merely a result. *State v. Fierro,* 166 Ariz. 539, 551, 804 P.2d 72, 84 (1990).

In support of finding the pecuniary gain aggravating factor, the trial court stated:

At trial the evidence showed that the [defendants] invaded the cafe and home where Jackie Appelhans and Dean Morrison resided and worked. They ransacked the buildings and took a number of items including cash. When they were stopped several hours later by DPS officers, the property was found in the defendants' ve-

hicle. The murders were committed in the course of and in furtherance of the robbery and flight from the robbery.

Defendants went to Grasshopper Junction after dark, robbed Morrison of money, stole the tow truck, and fled the scene after shooting the victims. *See State v. Martinez–Villareal*, 145 Ariz. 441, 451, 702 P.2d 670, 680, *cert. denied*, 474 U.S. 975, 106 S.Ct. 339, 88 L.Ed.2d 324 (1985) (pecuniary gain factor upheld where defendant was at murder scene to rob victims and took a pickup truck). Pecuniary gain was the primary motivation. *See Gonzales*, 181 Ariz. at 513, 892 P.2d at 849. Moreover, there is no factual support for the present claim that the deaths were unexpected or accidental. *Id.* The victims were shot execution style, lying on their stomachs, Appelhans' hand clutching Morrison's arm. *See State v. Hensley*, 142 Ariz. 598, 604, 691 P.2d 689, 695 (1984) (defendants robbed victims, then shot them while they lay on the floor, supporting finding that deaths were not accidental or unexpected).

We agree with the trial court that the evidence clearly leads to the conclusion that the murders were committed in furtherance of the goal of pecuniary gain and during the course of, or flight from, the robbery. *See State v. Schad*, 163 Ariz. 411, 420, 788 P.2d 1162, 1171, *aff'd*, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1989) (pecuniary gain factor upheld where defendant took victim's car and left murder scene with victim's wallet and money); *State v. Rockwell*, 161 Ariz. 5, 14, 775 P.2d 1069, 1078 (1989) (pecuniary gain factor upheld when defendant shot victim after robbery).

### 2. Especially Heinous, Cruel, or Depraved

 The especially heinous, cruel, or depraved circumstance is phrased in the disjunctive, so if any one of the three factors is found, the circumstance is satisfied. *Brewer*, 170 Ariz. at 501, 826 P.2d at 798.

### A. Especially Cruel

 Cruelty focuses on the victim and exists when there has been an infliction of pain and suffering, especially in a wanton, insensitive, or vindictive manner. *Correll*, 148 Ariz. at 480, 715 P.2d at 733. A crime is especially cruel when the defendant "inflicts mental anguish or physical abuse before the victim's death." *Walton*, 159 Ariz. at 586, 769 P.2d at 1032. Mental anguish results "especially if a victim experiences significant uncertainty as to the ultimate fate." *Brewer*, 170 Ariz. at 501, 826 P.2d at 798.

 The trial court specifically found that the killings were especially cruel, noting: the victims were kidnapped at gunpoint; they were forced to lie down; the crime occurred in the middle of the night and by surprise; the victims had no opportunity to defend themselves or summon aid; and they had time to consider their fate. "A murder is especially cruel if the victim consciously experienced physical or mental pain and suffering prior to dying." *Lopez*, 174 Ariz. at 143, 847 P.2d at 1090.

Due to the execution style of the murders, Appelhans clutching Morrison's arm, in addition to the lacerations on Morrison and signs of struggle, the state proved beyond a reasonable doubt that the victims suffered from mental as well as physical pain and suffering before death. *See State v. Herrera*, 174 Ariz. 387, 397, 850 P.2d 100, 110 (1993); *State v. Greenway*, 170 Ariz. 155, 166, 823 P.2d 22, 33 (1991); *Amaya–Ruiz*, 166 Ariz. at 177–78, 800 P.2d at 1285–86.

### B. Especially Heinous or Depraved

 Heinousness and depravity "focus on the defendant's mental state and attitude as reflected by his words or actions." *Brewer*, 170 Ariz. at 502, 826 P.2d at 799. We look for the following circumstances in determining whether a crime is especially heinous or depraved: (1) apparent relishing of the murder; (2) infliction of gratuitous violence on the victim beyond the murderous act itself; (3) mutilation of the victim's body; (4) senselessness of the crime; and (5) helplessness of the victim. *State v. Gretzler*, 135 Ariz. 42, 51–52, 659 P.2d 1, 10–11, *cert. denied*, 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983); *see also State v. Barreras*, 181 Ariz. 516, 522, 892 P.2d 852, 858 (1995). The last two factors are usually less probative of defendant's state of mind than the first three

factors. *Barreras,* 181 Ariz. at 522, 892 P.2d at 858; *State v. King,* 180 Ariz. 268, 287, 883 P.2d 1024, 1043 (1994) ("[O]nly under limited circumstances will the senselessness of a murder or the helplessness of the victim ... lead to [finding heinousness or depravity]."). Witness elimination is also given some weight in finding the circumstance. *State v. Ross,* 180 Ariz. 598, 606, 886 P.2d 1354, 1362 (1994). However,

> the witness elimination factor only applies if: 1) the victim witnessed another crime and was killed to prevent testimony about that crime, 2) a statement by the defendant or other evidence of his state of mind shows witness elimination was a motive, or 3) some extraordinary circumstances show the murder was motivated by a desire to eliminate witnesses.

*Barreras,* 181 Ariz. at 523, 892 P.2d at 859.

■ In finding heinousness and depravity, the trial court found gratuitous violence, helplessness, senselessness, and witness elimination. Gratuitous violence is supported by the numerous gunshot wounds to the victims' heads with different weapons, displaying violence far beyond that necessary to kill. *See Amaya–Ruiz,* 166 Ariz. at 178, 800 P.2d at 1286. The victims were relatively elderly and helpless against the younger assailants. *See Salazar,* 173 Ariz. at 412, 844 P.2d at 579; *Greenway,* 170 Ariz. at 166, 823 P.2d at 33. The trial court also noted that the victims could not have summoned aid easily, thus buttressing the finding of helplessness. The killings were senseless as they were unnecessary to defendants' goal of robbery. *See West,* 176 Ariz. at 448, 862 P.2d at 208.

The trial court also found that the only motive for the killings was to eliminate witnesses and aid defendants' escape from detection. The trial court made this finding without benefit of our later-issued *Ross* and *Barreras* opinions, which narrowed the types of cases justifying a finding of witness elimination. It is unnecessary for us to resolve whether the execution-style killings here, coupled with the other facts, would constitute the "extraordinary circumstances" to support

a finding of witness elimination under *Ross/Barreras'* third prong. Gratuitous violence, helplessness, and senselessness adequately support the (F)(6) finding against defendants.

### 3. Multiple Murders

■ Roger argues that it was double jeopardy to apply the multiple homicide aggravating factor in sentencing where the murders were part of the same offense. We have rejected this argument. *Greenway,* 170 Ariz. at 167–68, 823 P.2d at 34–35 (explaining that the (F)(8) aggravating factor applies to multiple murders).

## MITIGATING CIRCUMSTANCES

■ The sentencing judge must consider "any aspect of the defendant's character or record and any circumstance of the offense relevant to determining whether the death penalty should be imposed." *State v. Kiles,* 175 Ariz. 358, 373, 857 P.2d 1212, 1227 (1993) (internal quotations omitted). A defendant must prove mitigating factors by a preponderance of the evidence. *Greenway,* 170 Ariz. at 168, 823 P.2d at 35. The sentencing court must, of course, consider all evidence offered in mitigation, but is not required to accept such evidence. *State v. Ramirez,* 178 Ariz. 116, 131, 871 P.2d 237, 252, *cert. denied,* —— U.S. ——, 115 S.Ct. 435, 130 L.Ed.2d 347 (1994).

### I. Robert's Mitigation

Robert raises no mitigation issues on appeal. However, pursuant to our independent review, we review the mitigating factors presented in the trial court and search the record for any other mitigation. Robert presented six mitigating factors at the mitigation hearing:

1. Relatively Minor Participation
2. Intoxication [3]
3. No Threat to Society
4. Potential for Rehabilitation
5. Dysfunctional Childhood

---

**3.** Although the trial judge discussed intoxication as a nonstatutory mitigator in his verdict, we consider it for both statutory and nonstatutory

mitigation. *See Stokley,* 182 Ariz. at 519, 522, 898 P.2d at 469, 472.

**6. Nonviolent Criminal History**

We address each in turn.

**1. Relatively Minor Participation**

■ According to A.R.S. § 13–703(G)(3), mitigation exists where the defendant shows that he was "legally accountable for the conduct of another ..., but his participation was relatively minor, although not so minor as to constitute a defense to prosecution." Robert presented a videotape and transcript in which one William Motter, a detainee in the cell next to Roger at the Mohave County jail, discussed with an officer conversations he allegedly had with Roger. Motter stated that he had a number of conversations with Roger in which Roger admitted killing Morrison and Appelhans. Robert also elicited evidence that Roger is the leader and Robert the follower.

The trial court rejected this evidence, finding that the trial evidence showed that defendants acted in concert. He found the video testimony of Motter to be unreliable. The state's rebuttal evidence of a coded message from Robert to Roger, in which Robert stated that he would escape and come back for Roger, went against the evidence that Robert was the follower. Footprint evidence showed that both defendants were active in the crimes at Grasshopper Junction and both were armed when apprehended. In fact, Robert had two spent shotgun shells in his pants when detained. Robert failed to prove relatively minor participation by a preponderance of the evidence.

**2. Intoxication**

■ At trial, a witness testified that defendants were in a bar for several hours on the night of the crimes. At sentencing, Robert presented evidence that defendants were drinking at the bar. A forensic psychologist, Dr. Potts, who conducted a presentence evaluation of Robert, reported that Robert "admit[ted] to drinking copious amounts of alcohol" in the days prior to the crimes. Dr. Potts concluded, based on his interviews with defendant, that "[t]here is probably very little doubt as to his having been acutely intoxicated at the time of the offense. However, there is no evidence ... indicating any mental disorder or defect other than acute intoxication."

Voluntary intoxication may be mitigating if the defendant proves by a preponderance of the evidence that his "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." A.R.S. § 13–703(G)(1); *see also Atwood,* 171 Ariz. at 650–51, 832 P.2d at 667–68.

■ If impairment does not rise to the level of a statutory mitigating circumstance, the trial court should still consider whether such impairment constitutes nonstatutory mitigation, when viewed in light of defendant's alleged history of alcohol and drug abuse. *State v. Gallegos,* 178 Ariz. 1, 17, 870 P.2d 1097, 1113, *cert. denied,* — U.S. —, 115 S.Ct. 330, 130 L.Ed.2d 289 (1994). Although Dr. Potts reported that Robert had used alcohol and drugs in the past, there was no corroborating evidence of historic alcohol or substance abuse.

The trial court concluded that Robert "presented no evidence that the alcohol consumed by the defendant affected his state of mind." *Cf. State v. Rossi,* 154 Ariz. 245, 251, 741 P.2d 1223, 1229 (1987) (finding that proof of cocaine addiction and effects of addiction supported finding of inability to conform conduct to requirements of the law). Evidence suggested that defendants took steps to hide evidence of their conduct, showing that they appreciated the wrongfulness of their conduct. This evidence included driving the tow truck in the opposite direction from the direction in which they eventually fled, presumably as a decoy. *See Atwood,* 171 Ariz. at 651, 832 P.2d at 668. We agree with the trial court that defendant failed to show that he was significantly impaired by alcohol during the time of the crimes.

**3. No Threat to Society**

■ Robert argued to the court that a sentence of less than death would adequately protect society. The trial court concluded that this did not qualify as mitigation. We agree.

#### 4. Potential for Rehabilitation

The trial court found that defendant proved by a preponderance of the evidence that he is capable of rehabilitation. The court found the Rule 26.5 examination and report conducted by Dr. Potts persuasive. In that report, Dr. Potts concluded: "He is clearly rehabilitatable." We agree with the trial court that Robert proved potential for rehabilitation by a preponderance of the evidence. *See Rossi*, 154 Ariz. at 249, 741 P.2d at 1227.

#### 5. Dysfunctional Childhood

█ Robert's mother and aunt testified that Robert had a problem with involuntary bowel movements while growing up. Robert's mother also testified that his father hit Robert with his fists in disciplining him, made Robert quit high school to work full time, and made Robert get married at the age of 16 when he got his girlfriend pregnant. Dr. Potts concluded:

> [D]efendant was reared in an environment not conducive to good role-modeling. The mother was overprotective, with the father being distant, harsh and relatively uncaring. As a boy, Robert Wayne Murray suffered shame and isolation because of his urinary and bowel problems. These were neither recognized nor treated, condemning him to being an outcast.

The court found that Robert suffered from a dysfunctional childhood, being subjected to abnormal physical abuse and inconsistent discipline. Again, the court found the conclusions of Dr. Potts persuasive. However, difficult family background is nonmitigating unless defendant can show that something in that background impacted his behavior in a way beyond his control. *State v. Wallace*, 160 Ariz. 424, 427, 773 P.2d 983, 986 (1989), *cert. denied*, 494 U.S. 1047, 110 S.Ct. 1513, 108 L.Ed.2d 649 (1990). No such showing was made here.

#### 6. Nonviolent Criminal History

█ Robert argued that, although he had a previous criminal history, it was nonviolent—involving property offenses. Robert does in fact have a history of offenses, including burglary and theft, for which he served time in prison in Alabama. In rebuttal, the state showed that, at the time of his arrest, he was wanted in Alabama for armed robbery and assault. We conclude he has not shown mitigation in this regard.

### II. Roger's Mitigation

In the trial court, Roger raised the following statutory mitigating circumstances:

1. Capacity to Appreciate Wrongfulness of Conduct or Conform Conduct to Requirements of Law
2. Relatively Minor Participation
3. Age

On appeal, he also argues that the following statutory mitigators apply:

4. Duress
5. No Reasonable Foreseeability that Conduct Would Create a Grave Risk of Death

At trial, he raised the following as nonstatutory mitigation:

6. Dysfunctional Childhood and Family Relations
7. Medical Treatment
8. Remorse
9. Drug and Alcohol Use
10. Mental Health

Roger also raises for the first time on appeal:

11. Education
12. Residual or Lingering Doubt
13. Felony Murder Instruction
14. Cooperation

As part of our independent review, we address each alleged statutory mitigating factor.

#### 1. Capacity to Appreciate Wrongfulness of Conduct or Conform Conduct to Requirements of Law

█ Roger argues that his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired. *See* A.R.S. § 13–703(G)(1). This factor is disjunctive, "so that proof of incapacity as to either ability to appreciate or conform estab-

lishes the mitigating circumstance." *State v. Wood,* 180 Ariz. 53, 70, 881 P.2d 1158, 1175 (1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2588, 132 L.Ed.2d 836 (1995). He cites serious problems as a juvenile, hyperactivity, multiple head injuries, and increased susceptibility to the effect of alcohol and illicit substances as proof that he was unable to appreciate the wrongfulness of his conduct.

### a. Serious Problems as a Juvenile

Roger was arrested for shoplifting at the age of 9. At 13, he was permanently expelled from junior high for bringing a gun to school and was placed on supervised probation in a detention home for juvenile delinquents. In his statement, he wrote that he told his friends at school that he could use the gun to "blow Mr. [illegible]'s brains out if I wanted to." While serving in the detention home, an official reported:

Roger is very destructive—he constantly talks about killing people esp. policemen. Roger has serious emotional problems—when he isn't crying he is cursing or destroying things around the house. He needs help that we cannot give him here. He is a time bomb waiting to go off.

A psychologist who subsequently conducted an evaluation of Roger for legal authorities stated:

My fear is that Roger will have no care for society. I believe that Roger and society are going to be at odds until some drastic steps are taken. It appears that it would be to Roger's benefit for those steps to occur as soon as possible if we are going to have a chance of changing his behavior.

After vandalizing a cemetery at age 14, he was committed to the Alabama Department of Youth Services for Criminal Mischief. During this commitment a counselor reported that Roger was receiving behavioral counseling, "but at present [he] just simply does not appear interested in rectifying his misdeeds." Roger also received drug and alcohol counseling. At 17, he pled guilty to the unauthorized use of a vehicle, and he was placed on probation. A few months later, he was again charged with unauthorized use of a vehicle. Also at 17, Roger was arrested for two separate incidents involving armed rob-

bery and third degree burglary and theft. He admitted the theft and robbery. The robbery charge was dismissed. Roger was convicted as an adult for burglary and sentenced to boot camp, which he failed. He was then sentenced to prison for four years and was released in 1990.

A sociologist testified that authorities became familiar with Roger's problems as a youth, including tendencies towards aggression, but did nothing about it. On cross-examination, the sociologist acknowledged that Roger received counseling from the Franklin County Juvenile Court. He also testified that Roger knew killing people was wrong. As is unfortunately true in so many murder cases, defendant's troubles with the law began early. His experiences, while demonstrating that his problems started early and were exacerbated by neglect, familial and official, also amply demonstrate his dangerousness. He has failed to show, however, that his juvenile experiences significantly impaired his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law.

### b. Head Injuries

Head injuries that lead to behavioral disorders may be considered a mitigating circumstance. *See Rockwell,* 161 Ariz. at 15, 775 P.2d at 1079. Roger's aunt testified that Roger fell and hit his head as a child, but provided no further details. Roger's mother testified that he hurt his head by slipping on ice as a child. The presentence evaluation by Dr. Potts indicated that Roger had a "cerebrovascular accident, quite probably secondary to PCP ingestion" in 1990. Dr. Potts concluded that multiple head injuries "probably contributed to further deterioration" leading to impulsive behavior. The foundational evidence concerning head injuries suggests nothing more than the normal childhood injuries. The trial court rejected them as a basis for a (G)(1) finding, and we agree.

### c. Hyperactivity and Impulsivity

Roger argues that evidence of his hyperactivity shows that he acted impulsively and was unable to conform his conduct to the

requirements of the law. Roger's mother and aunt testified that he was hyperactive while growing up. In 1984, a psychologist gave a diagnostic impression that Roger had a conduct disorder and was undersocialized and aggressive, after which Roger received more than a year of treatment and rehabilitation at the Alabama Department of Youth Services. Dr. Potts diagnosed defendant with attention deficit/hyperactivity disorder. Defense psychiatrists diagnosed Roger as having an anti-social personality disorder and traumatic stress disorder symptomatology. Dr. Potts concluded:

> The defendant's life has been directed by what is quite probably an organic brain disorder. The psychological testing conducted upon defendant since he was 14 is consistent with brain damage. It manifests as hyperactivity, poor impulse control, a short fuse, violent rages, and increased susceptibility to the effects of alcohol and other illicit substances.

A sociologist opined at sentencing that the homicides appeared impulsive.

In rebuttal on impulsiveness, the state offered testimony of a victim and investigating officer for a crime in Alabama for which the defendants were suspects. The 78-year-old victim testified that on April 30, 1991, two weeks before the crimes at Grasshopper Junction, she had been assaulted and robbed by two men at her home in Mt. Hope, Alabama. They came to her house about 9:00 p.m., armed, tied her up, beat her, ransacked her house, and took off with valuables. The heavy set man wore a mask and carried a pistol. The other man did not cover his face. She identified that person as Roger in a photo lineup on May 2. She also identified the mask, a sleeve cut out of a sweatshirt. Mike Ball, Alabama Bureau of Investigations, testified that a sweatshirt with a sleeve missing was found by the Murray brothers' father and turned over to police. The material matched that of the mask.

The state also offered evidence concerning a shotgun sold to an individual in Las Vegas on May 11 or 12. The man who purchased the gun drove a white Ford sedan. Although the seller of the gun could not positively identify either defendant, the serial number of the gun matched the gun found in defendants' car. The gun had been sawed off since it was sold; a hacksaw was found in defendants' vehicle. The phone number and address of the man who sold the shotgun were also found in the car.

[100] Character or personality disorders alone are generally not sufficient to find that defendant was significantly impaired. *Apelt*, 176 Ariz. at 377, 861 P.2d at 662. A mental disease or psychological defect usually must exist before significant impairment is found. *Id.*

Despite the evidence of hyperactivity and anti-social personality disorder, "[t]his case does not involve the same level of mental disease or psychological defects considered in other cases in which the § 13–703(G)(1) mitigating circumstance was found to exist." *Brewer*, 170 Ariz. at 505, 826 P.2d at 802. The trial court found that the offenses were not impulsive, but were planned in advance. The trial court noted that using the tow truck as a decoy is evidence that defendants knew their conduct was wrongful. *See Stokley*, 182 Ariz. at 520, 898 P.2d at 469. The atlas found in the Tempo that had Grasshopper Junction circled, though it was not marked otherwise, also suggests that defendants carefully chose this site for the crime. Although Roger's hyperactivity was proven by a preponderance of the evidence, there is no evidence that he did not know that his conduct was wrongful. Defendant also failed to show that his ability to control his actions was substantially impaired. *See Brewer*, 170 Ariz. at 505–06, 826 P.2d at 802–03.

#### d. Alcohol and Illicit Drugs

[101] Intoxication may constitute statutory mitigation. *Atwood*, 171 Ariz. at 650–51, 832 P.2d at 667–68. Evidence was presented that Robert and Roger consumed alcohol on the night of the crimes. *See supra* Robert's Mitigation. However, no evidence quantified the amount of alcohol consumed. In the presentence investigation, Roger reported that he was a regular consumer of alcohol and user of illicit drugs, including cocaine, methamphetamine, heroin, and crack cocaine. Dr. Potts concluded that his "abilities to con-

form his conduct to the requirements of the law are markedly diminished because of illicit substance abuse."

The trial court noted there was no evidence that defendant was intoxicated at the time of the offense. Roger failed to show alcohol or illicit drugs impaired his ability to appreciate wrongfulness or conform his behavior to the requirements of the law. *See Stokley*, 182 Ariz. at 521, 898 P.2d at 470.

### e. Conclusion

Roger fails to show how any of these factors (juvenile problems, head injuries, hyperactivity, or alcohol or drugs), whether independently or combined, affected his capacity to appreciate the wrongfulness of his conduct or to conform his behavior to the requirements of the law.

### 2. Relatively Minor Participation

[102] Under A.R.S. § 13–703(G)(3), mitigation exists where the defendant shows that he was "legally accountable for the conduct of another ..., but his participation was relatively minor, although not so minor as to constitute a defense to prosecution."

Roger argued that letters to him from Robert exculpate him. In the jailhouse letters, Robert admits participating in the killing of Morrison and Appelhans, but does not indicate the role Roger did or did not play. On appeal, Roger also argues that there is no evidence to prove that he shot any of the guns at Grasshopper Junction.

The trial court concluded that defendants acted in concert, considering the footprint evidence, the fact that both defendants were armed at the time of arrest, and that the victims suffered numerous bullet wounds from different weapons. Roger failed to show by a preponderance of the evidence that he was a minor participant in these crimes.

### 3. Age

[103, 104] Roger was 20 years old at the time of the crimes. *See* A.R.S. § 13–703(G)(5). When age is raised as a mitigating factor, the court should consider the defendant's criminal history, experience with law enforcement, maturity, intelligence, and extent of participation and deliberation in the murder. *West*, 176 Ariz. at 451, 862 P.2d at 211 (criminal history and experience); *Runningeagle*, 176 Ariz. at 66, 859 P.2d at 176 (maturity and intelligence); *State v. Herrera*, 176 Ariz. 21, 34, 859 P.2d 131, 144 (extent of involvement), *cert. denied*, —— U.S. ——, 114 S.Ct. 398, 126 L.Ed.2d 346 (1993); *State v. Gillies*, 135 Ariz. 500, 513, 662 P.2d 1007, 1020 (1983) (deliberation).

Evidence was presented that Roger's cognitive abilities were "grossly within normal limits" and "his thought processes were goal directed and intact." He had a high school education and was a certified paralegal. There is no evidence that the crimes were a product of immaturity.

As previously discussed, Roger had a long history in the juvenile justice system of Alabama. After his arrest for armed robbery, burglary, and theft at the age of 17, Alabama denied youthful offender status. In denying youthful offender status, the Alabama Board of Pardons and Paroles officer concluded,

> This subject bears a bad reputation in Colbert County. He is considered to be dangerous, as he has a thing about guns. He has been stealing since he was 9 years old. He has been through the Juvenile Court System, and this has not helped him any. He runs with a bad crowd [of] older people. He has never worked to amount to anything and as stated above, he is considered to be dangerous by the folks who know him.

Another parole officer, who had first met Roger four years before, concluded,

> Roger Wayne Murray is a dangerous individual. I believe that if left to remain in society, he will harm and continue to harm people.... Roger ... should be treated as an adult, in order that society might be protected from such aggressiveness and abusive personality.

He was released from prison in January 1990. In January 1991, defendant was charged with theft of property, attempt to elude, and driving without a license. At the time of these offenses at Grasshopper Junc-

tion, Roger was a suspect in Alabama for robbery and assault in the first degree.

In light of Roger's intelligence, criminal history, experience with law enforcement, extent of involvement, and the deliberate nature of the murders, we agree with the trial court that his age is not a mitigating factor. *See State v. Bolton,* 182 Ariz. 290, 314, 896 P.2d 830, 854 (1995) (age undermined as mitigating factor when defendant had been incarcerated as a juvenile, had prior felony conviction, and was awaiting trial for another crime); *Greenway,* 170 Ariz. at 169, 823 P.2d at 36 (age of 19 not sufficiently mitigating to call for leniency of defendant found with aggravating factors of pecuniary gain, cruelty, heinousness, and depravity, and multiple homicides). Roger fails to show how his age impaired his judgment in committing the crimes. *See Salazar,* 173 Ariz. at 414, 844 P.2d at 581.

### 4. Duress

[105, 106] On appeal Roger raises the statutory mitigating factor of duress, arguing that Roger must have been doing whatever Robert desired in committing the crimes. *See* A.R.S. § 13–703(G)(2). At the sentencing hearing a sociologist testified that Roger looked up to his brother Robert.

Duress is defined as "any illegal imprisonment, or legal imprisonment used for an illegal purpose, or threats of bodily or other harm, or other means amounting to or tending to coerce the will of another, and actually inducing him to do an act contrary to his free will." *State v. Castaneda,* 150 Ariz. 382, 394, 724 P.2d 1, 13 (1986). There is no evidence that Roger was under duress from Robert. Roger fails to show how his alleged desire to please his brother amounted to duress.

### 5. No Reasonable Foreseeability that Conduct Would Create a Grave Risk of Death

[107] Under A.R.S. § 13–703(G)(4), Roger argues that he was immature, a follower, idolized his brother, and therefore could not foresee that the conduct would create a grave

risk of death. Even if true, such evidence would fail to prove that he could not reasonably foresee his conduct would create a grave risk of death.

### 6. Dysfunctional Childhood and Family Relations[4]

Roger's younger sister testified that their father hit Roger with fists, a belt, and a switch and that Roger left the house at the age of 14 or 15. On cross-examination she stated that she only saw her father hit him with a fist once or twice. Roger's mother also testified that his father hit him with his fists about six times and with a switch about once or twice a month. Evidence was presented at trial that the divorce of Robert's parents had an effect on him. After the divorce, his father shunned him. A sociologist who reviewed the presentence investigation report, Roger's school records, Dr. Potts' report, and interviewed Roger, concluded that Roger was raised in a nonnurturing dysfunctional family environment.

A difficult family background alone is not a mitigating circumstance. *Wallace,* 160 Ariz. at 427, 773 P.2d at 986. "If it were, many homicide defendants could point to some circumstance in their background that would call for mitigation." *Bolton,* 182 Ariz. at 314, 896 P.2d at 854. Family background is a mitigating circumstance only if a defendant can show that something in that background had an effect or impact on his behavior that was beyond the defendant's control. *Id.*

The trial court found Roger's dysfunctional childhood was a mitigating factor. The trial court agreed that defendant "suffered from a less than ideal environment as a child." We agree that Roger comes from a dysfunctional family, but he fails to show how this background impacted his behavior at Grasshopper Junction.

### 7. Medical Treatment

[108] Roger claims that medical problems as a child constitute mitigation. Dr. Potts concluded: "Had he been in a more

---

4. The following elements of potential mitigation discussed in the verdict or raised on appeal are combined in this section: child abuse, excessive corporal punishment, negative role models, and environment.

understanding and caring environment where there was less conflict and abuse, he may have been referred for and accepting of medical treatment." We find nothing mitigating in connection with his claimed alleged medical problems as a child.

### 8. Remorse

[109, 110] Remorse may be considered in mitigation. *Brewer,* 170 Ariz. at 507, 826 P.2d at 804; *State v. Tittle,* 147 Ariz. 339, 344, 710 P.2d 449, 454 (1985). In a letter to the trial judge just prior to the aggravation/mitigation hearings, Roger wrote, "There is not one piece of evidence that points to me as having killed Mr. Morrison or Ms. Appelhans. There is evidence that someone did. But I am not responsible." Defendant failed to prove by a preponderance of the evidence that he was remorseful.

### . 9. Drug and Alcohol Use

[111] If impairment does not rise to the level of a statutory mitigating circumstance, the trial court should still consider whether such impairment constitutes nonstatutory mitigation, when viewed in light of defendant's alleged history of alcohol and drug abuse. *Stokley,* 182 Ariz. at 523, 898 P.2d at 472. In the presentence investigation, Roger reported that he was a regular consumer of alcohol and user of illicit drugs. However, defendant's historical substance abuse is self-reported and uncorroborated. *See Gallegos,* 178 Ariz. at 18, 870 P.2d at 1114 (defendant's claim of serious alcohol dependency is largely uncorroborated). The trial court noted there is some evidence that Roger habitually used drugs and alcohol. The court rejected intoxication as a mitigator because Roger performed complicated physical maneuvers at Grasshopper Junction. Roger has failed to prove that his alcohol or drug use is a non-statutory mitigating factor.

### 10. Mental Health

[112] The trial court found that Roger's mental health is entitled to some weight as nonstatutory mitigation. *See Stokley,* 182 Ariz. at 524, 898 P.2d at 473. We agree that Roger proved that he suffers from hyperactivity and *may* suffer from other mental dis-

orders. However, he fails to prove that he suffers from brain damage. His mental health is entitled to some nonstatutory mitigating weight.

### 11. Education

[113] Although Roger dropped out of high school, he received his diploma and became a paralegal. He argues that this constitutes mitigation because it "demonstrates that in a controlled environment, [he] can reside within our society and abide by the rules and be an asset." Obviously, such accomplishments did not prevent the terrible crimes in this case.

### 12. Residual or Lingering Doubt

Roger argues that a residual or lingering doubt exists regarding whether he actually participated in the homicides. We find no such doubt.

### 13. Felony Murder Instruction

[114] A felony murder instruction can only be mitigating where there is some doubt regarding defendant's specific intent to kill. *Bolton,* 182 Ariz. at 315, 896 P.2d at 855. Such mitigation is therefore precluded where there has been a finding of guilt for premeditated first degree murder.

### 14. Cooperation

[115] Roger argues that he was fully cooperative at the time of the arrest and that he "never pointed his gun [at the officer], even though he was in a position to shoot if he had wanted to." Not murdering an additional person hardly demonstrates "cooperation." Roger and Robert were apprehended only after a high speed chase, during which they ran an armed roadblock. Their behavior before and after arrest was not cooperative.

### III. Weighing Aggravation and Mitigation

[116] Roger argues that the mitigating evidence presented was improperly discounted by the trial judge. Where a sentencing court has failed to consider adequately evidence in mitigation, a death sentence cannot

stand. *Jeffers v. Lewis,* 5 F.3d 1199, 1204–05 (9th Cir.1992). The trial court completed very detailed special verdicts, showing that the trial court carefully considered all evidence presented in weighing the mitigating and aggravating factors.

## IV. State's Rebuttal Evidence

[117] Roger argues, without support in the record, that the court improperly allowed in evidence supporting the aggravating factors after defendants rested on mitigation. However, the state rested entirely on trial evidence for the statutory aggravators. After Roger and Robert presented their mitigation, the state called three rebuttal witnesses, all properly disclosed in a timely fashion, who had not testified at trial. Defendants objected on relevancy grounds. The state pointed out that it was submitting this evidence to rebut mitigation, in particular defense claims of impulsiveness (Roger) and to show that the proffered mitigation was not sufficiently substantial to call for leniency (Robert). Clearly, the state is entitled to rebut mitigation.

There is no suggestion in the record that the judge considered the rebuttal evidence in connection with anything but mitigation.

## CONCLUSION

[118] There are three statutory aggravating circumstances for each defendant for each count. Neither defendant has established any statutory mitigating circumstances. We have considered the nonstatutory mitigating factors for each defendant, including those falling short of establishing statutory mitigation. We find the mitigation, at best, to be minimal. Certainly, there is no mitigating evidence sufficiently substantial to call for leniency. We have searched the record for fundamental error and found none. *See* A.R.S. § 13–4035 (1989). The convictions and sentences are affirmed.

FELDMAN, C.J., and CORCORAN, ZLAKET and MARTONE, JJ., concur.